THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MACK LITTLEJOHN, Defendant-Appellant.

First District (1st Division)   No. 83—2405

Opinion filed May 27, 1986.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Peter D. Fischer and Sharon Johnson Coleman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Mack Littlejohn was found guilty of murder and attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9–1, 8–4), and was sentenced to 50 years in the Illinois Department of Corrections. Defendant appeals his conviction. For the following reasons, we reverse and remand for a new trial.

At trial, the State presented the testimony of Joanne Lee, defendant's common law wife. Lee testified that she first met defendant through his brother Odell nine years prior to the instant offense. At that time, defendant lived in Philadelphia, Pennsylvania, and he and Lee visited every two or three months over the next eight years. Defendant either worked or attended school during this time. In November 1980, defendant moved from Philadelphia to Chicago, Illinois,

and he and Lee began living together. Defendant worked six days a week as a pharmacist and paid the rent and all other expenses. On October 19, 1981, the couple's daughter, Jane Marie Littlejohn, was born. Defendant was very proud of the baby, and Lee never saw him strike her.

Lee testified that after the baby's birth, defendant began having job difficulties. He never had problems at work before. Although defendant did not attend church, he had become very interested in religion. He and Lee also used drugs, including marijuana, cocaine and TAC. On the night of November 13, 1981, defendant and Lee smoked two marijuana cigarettes and drank mescal until early morning. Lee fell asleep, but was awakened at approximately 5 a.m. by defendant who had telephoned his brother, Odell, and got into a loud argument about a debt. Defendant and his brother normally got along well. Lee saw defendant put down the telephone and go into the bathroom, and she picked up the telephone and began talking to Odell. When defendant returned from the bathroom, he told Lee he would slap her if she did not put down the telephone. Lee sat down on the couch and heard defendant yell at his brother not to call or come over anymore. Defendant then went to the record player where he kept his knives. The next thing Lee knew, defendant was standing over her with the knives open and held in the shape of a cross. Without saying a word, defendant stabbed her, and she ran out the door.

Lee subsequently knocked on two neighbors' doors, but got no response. She then remembered the baby and ran back upstairs. She heard the click of her apartment door lock, and her legs collapsed. Lee crawled to the door and banged on it, calling out to defendant, "Mack, don't let me die in this hallway." Defendant did not respond, but Lee could hear the baby crying. The crying suddenly stopped and defendant said, "Everything's all right now." Lee then heard defendant call for an ambulance. Thereafter, she heard nothing but a radio. Police arrived, and Lee was taken to the hospital where she underwent surgery for 23 stab wounds.

Chicago police officer John DiMaggio testified that he responded to an emergency call at defendant's apartment on November 14, 1981. When he arrived, he found a woman covered with blood in a kneeling position on the second floor. He saw defendant, wearing only a black T-shirt, going toward the bathroom, and he handcuffed him. DiMaggio found a baby on the couch with numerous stab wounds. The baby was pronounced dead at the scene. DiMaggio testified that defendant told him in a calm manner, "I killed them both. God made me do it."

Dr. Joanne Richmond testified that she performed an autopsy on the infant. The child died of extensive bleeding due to five stab wounds.

Assistant State's Attorney Robert Loeb testified that he interviewed defendant on the morning of November 14, 1981. Defendant told Loeb that he attended three colleges, obtained degrees and worked as a pharmacist. Defendant stated that he and Lee smoked marijuana and drank tequila on the night of November 13, 1981. At approximately 5:30 a.m., their baby started crying. Lee went to change the baby's diaper and defendant called his brother, Odell. He was angry because Odell had "flimflammed" him out of some money. He became angrier when Lee got on the telephone and talked nicely to Odell because she and Odell had once been sexually involved. Defendant told Lee to hang up the telephone and he decided to stab her when she refused to do so. Defendant went over to the couch where he had placed two knives in the pattern of a cross. He recalled picking up one of the knives and stabbing Lee at least three times "in the fifth intercostal space" in order to "insure the total destruction of her heart." Lee ran screaming into the outside stairwell and defendant locked the apartment door. He decided to stab the baby in a "similar vital spot." Loeb testified that defendant stated with respect to Lee, "I knew what I was doing. I don't want to hurt my case anymore, but I should have known better." Defendant also told Loeb several times that he loved the baby, who was named after his mother.

The State rested and defendant relied on the defense of insanity. Testifying first for defendant was his brother, Odell Littlejohn. Odell testified that defendant got married in 1958 and was a very loving father to his four living children by that marriage. Odell never saw defendant strike any of his children. Defendant was in the Navy for four years and after being honorably discharged attended pharmacy school. Prior to 1980, defendant lived in Philadelphia and Odell visited him once or twice and saw nothing unusual about him. When defendant returned to Chicago in 1980, he took Odell to a store where he purchased a skull. Thereafter, Odell often saw defendant with the skull on a chain around his neck. Odell also twice saw defendant perform a ritual with the skull in which he darkened the room, lit the skull with a candle, read tarot cards and kissed and talked to the skull. This was the first time Odell saw defendant act in this manner.

Odell testified that when he spoke with defendant on the telephone during the early morning hours of November 14, 1981, defendant threatened him and "started talking out of his head." Defendant told Odell he had three rifles and that Odell should not come to his

house. Odell and defendant did not have any "real fights" prior to this time. When defendant hung up the telephone, Odell called him back to ask what was wrong, but defendant hung up again. Odell testified that he had never seen defendant strike Joanne Lee.

Gwendolyn Littlejohn testified that she was the wife of Odell Littlejohn and had known defendant for approximately 17 years. She stated that defendant had been close with his family and was a good father. Gwendolyn never saw him strike any of his children. Defendant lived in Philadelphia from 1970 to 1980 and therefore she did not see him often. When defendant returned to Chicago in 1980, he stayed with her and Odell for a month. During that time, Gwendolyn went to defendant's bedroom and saw that it was darkened and that defendant was using a candle, skull and some tarot cards. This was the first time defendant acted in this manner. After a couple of months, Gwendolyn asked defendant to move out because she was scared of having the skull, cards and candle in her home.

Approximately one week prior to the instant offense, Gwendolyn went to defendant's house and talked with defendant. Defendant told Gwendolyn that he had spoken with his mother and had asked her about Joanne. Gwendolyn thought this was odd since defendant's mother died in 1978. During the next week, defendant called Gwendolyn two or three times a day and repeatedly asked her if she and her children were alright. He had never done this before.

Dr. Gerson Kaplan, a psychiatrist at the Cook County Psychiatric Institute, testified that he examined defendant four times during January and February of 1982. Dr. Kaplan was of the opinion that at the time of the offense defendant was incapable of appreciating the criminality of his conduct or conforming his conduct to the requirements of the law, and therefore was legally insane. In reaching this opinion, he reviewed social histories from defendant and Joanne Lee, police reports, psychological examination results by psychologist Joanne Sterling, and a report compiled on defendant by the Institute in 1977 on a different matter. Dr. Kaplan additionally relied on information supplied by defendant that his first wife had killed their child in 1960 and that as a result he was depressed and saw a psychiatrist while in the Navy. Dr. Kaplan was aware that defendant had experienced the death of a daughter in 1976, the death of a son in 1977, the death of his mother in 1978, the death of his older brother in 1979 and the death of his nephew in 1980. The death of defendant's mother was particularly significant and defendant was still grieving at the time he killed his child, who had been named after his mother.

Based on his personal examination of defendant and the foregoing

information, Dr. Kaplan concluded that at the time of the offense defendant suffered from a mental disease, atypical psychosis. Atypical psychosis is a term used when the available information does not seem to fit other known diagnostic conditions but nevertheless indicates a definite psychotic condition. Approximately 5% of those diagnosed psychotic fall into this category. Dr. Kaplan stated that the atypical psychosis was triggered by the baby's birth and had progressed to a "full-blown" condition over the next few weeks.

Dr. Kaplan testified that by the time of the offense, defendant's psychosis had resulted in delusions relating to religious ideation, including defendant's belief that Joanne Lee was possessed by the devil and that God made him do it. The psychosis rendered defendant legally insane on November 14, 1981, the time of the offense. Dr. Kaplan stated that a legally insane person suffering from such a psychotic condition would not necessarily show symptoms of it 24 hours a day. The person could remain relatively calm and refrain from reporting delusional material during police interrogation. In fact, apparent calm frequently occurs and is "a very typical manifestation of psychosis resulting from the effort to hide confusion and turmoil." Dr. Kaplan stated that following his arrest, defendant spent four days in the psychiatric ward of Cermak Hospital where he was given Elavil, an antidepressant used to alleviate a major depressive condition or reaction. By the time Dr. Kaplan interviewed him, defendant did not show psychotic symptoms. Dr. Kaplan attributed this to the fact that defendant's psychosis was in remission and that no acute disturbance then existed.

Dr. Kaplan testified that he was aware of defendant's superior intelligence and advanced education. He did not believe, however, that defendant was lying when he reported to the police, "God made me do it." In fact, defendant actually denied hallucinations, delusions, severe anxiety or depression. Dr. Kaplan stated that such denial is common and results from the frightening and helpless nature of the experience. Dr. Kaplan was aware that defendant was alleged to have ingested four or five marijuana cigarettes per month and four or five cocaine usages per year. This frequency of drug use could not lead to drug-induced psychosis, nor could the two marijuana cigarettes and tequila that defendant allegedly ingested prior to the offense cause drug-induced psychosis.

Dr. Alan Stipes, a psychiatrist at the Cook County Psychiatric Institute, testified that he examined defendant in May 1981 and in May 1983. Dr. Stipes agreed that at the time of the offense defendant was unable to appreciate the criminality of his conduct or conform his con-

duct to the requirements of the law. In making this determination, Dr. Stipes relied on Dr. Kaplan's reports, other 1982 psychological reports, two 1978 psychological reports, police reports, the deaths of defendant's two children and three other family members between 1976 and 1980. Dr. Stipes also agreed with Dr. Kaplan's diagnosis of atypical psychosis. Dr. Stipes, however, believed that the psychosis was only in partial remission because defendant still experienced delusions at the time he examined defendant. Even at the time of the May 1983 interview, defendant talked of events evidencing supernatural forces and believed that his behavior and life had been influenced by evil spirits. The delusions exhibited by defendant could have fit schizophrenia or other psychoses considered forms of mental disease.

Dr. Stipes testified on cross-examination that dialing a telephone number or driving to work shows only an ability to control a particular behavior. Psychosis does not evidence itself every second of every day. From the time that defendant realized his delusional belief that Joanne Lee was Satan, he was compelled and was unable to control his behavior. His telephone call to the police reporting a stabbing was not inconsistent with a belief that the woman stabbed was Satan. The fact that defendant was calm and said, "God made me do it," was not inconsistent with psychosis. In fact, calmness and "flattened affect" are characteristic of psychosis. Dr. Stipes stated the fact that defendant told a prosecutor that he knew what he was doing and should have known better did not necessarily indicate that he was able to appreciate the criminality of the act. Dr. Stipes ruled out psychosis due to drug use and stated that he never sensed defendant was malingering.

Joanne Sterling, a State-registered clinical psychologist serving as a consultant to the Psychiatric Institute, testified that she first interviewed defendant on January 19, 1982, and again interviewed him in May 1983. Dr. Sterling was of the opinion that on the date of the offense defendant was too psychotic, mentally deranged and .delusional to conform his conduct to the requirements of law or to appreciate his conduct. Her opinion was based on her two examinations of defendant, during which defendant was given screening tests consisting of basic IQ items, one ink blot card and one TAT (Thematic Apperception Test) card. Sterling also relied on police reports. Following the first examination, Sterling arrived at a diagnosis of depressive psychotic reaction. She stated that at the time of the offense, defendant was suffering from delusional religious ideation consisting of strange ideas that his wife and child were possessed by the devil and had great powers over him. He also believed that his wife had stabbed their

baby. Sterling stated that defendant was severely depressed and had been given Elavil, an antidepressant having the most immediate effect, because of the danger of suicide.

Sterling further testified that at the time of the second interview, defendant was still talking about the power of tarot cards. Defendant stated that he was becoming an adversary of Satan, who had convinced him that Joanne Lee was a vessel of Satan. After this interview, Sterling concurred in the diagnosis of atypical psychosis in fair remission. She stated that while defendant may have appeared calm when talking to the police, he could have been in shock or in a stupor. The drug use reported to Sterling was not significant enough to take into account in a diagnosis. Sterling also testified that she is trained to spot malingering and that defendant was not feigning symptoms.

In rebuttal, the State presented the testimony of Drs. Orest Wasyliw and Robert Wettstein and Detective John Dolan. Dr. Wasyliw, a psychologist at the Isaac Ray Center, testified that he administered the Minnesota Multiphasic Personality Inventory (MMPI) to defendant in May 1982. Dr. Wasyliw determined that defendant was not malingering in his responses. If anything, he was trying to steer the results in the direction of denying psychological distress. Dr. Wasyliw believed the test results supported a diagnosis of paranoid personality disorder. In a report to Dr. Wettstein, Dr. Wasyliw recommended exploration of the possibility of delusions with respect to suspiciousness and perceived threats. His report stated, "The profile, in general, can be indicative of either severe characterological disturbance or psychotic process and the specific test results could support either possibility." Dr. Wasyliw gave no opinion as to defendant's sanity at the time of the offense.

Dr. Robert Wettstein, a psychiatrist at the Isaac Ray Center, testified he interviewed defendant in May 1982 and June 1982. Dr. Wettstein also relied on police records and interviews with Joanne Lee, Odell Littlejohn and the manager of the drug store where defendant worked. With respect to insanity, Dr. Wettstein could not identify any prior mental illness and was of the opinion there was no mental illness or defect at the time of the offense. Dr. Wettstein defined "mental disease" as "a condition which significantly impairs a person's ability to think or in some cases to act, as well as alters their emotional feelings at the time, which lasts for a period of time. It doesn't just come and go quickly over a period of time." Dr. Wettstein had no opinion as to whether defendant could conform his conduct to the requirements of the law at the time of the offense.

Detective John Dolan testified that he interviewed defendant on

the morning of November 14, 1981, and that he spoke in a monotone voice. Defendant told Dolan that his knives were intended to show people what harm would come to them if they hurt his child and that he had planned to photograph the knives before he used them to stab Joanne Lee. Defendant also told Dolan that he stabbed Joanne because he felt she had to die and that he stabbed his baby because he felt "compelled" to kill her.

## I

■ On appeal, defendant first argues that error occurred when, during the cross-examination of defense expert Dr. Kaplan, the State asked whether it would affect his opinion about insanity to know that defendant had given seminars on psychiatric disabilities. After defense counsel's objection was overruled, Dr. Kaplan testified that it would not change his finding but that defendant's answers to questions could have been influenced by sophisticated knowledge of psychiatry. Defendant contends that this cross-examination was improper because there was no evidence in the record that defendant had taught seminars on psychiatric disabilities. Defendant further urges that this error was compounded by the fact that both prosecutors during closing argument made reference to the seminars on the following three occasions:

"[H]e's had some training. He knows a little bit about psychiatry. He may not be a master, but he knows enough. He knows enough to con a psychiatrist, and he's trying to see if he knows enough to con us.

\* \* \*

The Defendant—this person who is fighting a serious charge of murder, ladies and gentlemen, who is fighting it and who is sophisticated and who is of superior intelligence and who understands, according to Doctor Stipes, the defense of insanity at the time of the crime—this is the person who is telling you this—this person who has lectured at universities on psychiatry. This is the person whose word you are supposed to take, that he could not control his behavior at the time of the crime.

\* \* \*

What else do we know about him? We know that Mack Littlejohn had the opportunity to go to college. Not only to go to college, he had the opportunity to go on after college, to get his Master's in pharmacy. Then he went on after that and became a doctor, a PhD in pharmacy. He went on after that to teach in a college in Philadelphia.

Not just to lecture—this was a professor. He taught in that school. He taught there for a long time.

What else did we learn about him? We also knew he gave, at least, two lectures—two different years—1974 and 1975. What did he give those lectures on? Psychiatric disorders and their treatment.

This man is not stupid. This man is not dumb. This man took advantage of what he knows.

This man is a fraud. The man is a con artist."

The assumption of unproven facts in cross-examination and closing argument is improper. (*People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778.) In *Curry*, the prosecutor suggested in cross-examination that a defense witness had been in possession of a gun during a shooting. This assumption was then bootstrapped to the level of "evidence" during closing argument. This court held that the cross-examination and final remark of the prosecutor were improper and ordered that they not be repeated on retrial.

Similarly, in *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 428 N.E.2d 503, the prosecutor during cross-examination of a defense witness implied the existence of unproven facts prejudicial to the defendant. We held that such cross-examination was error and resulted in substantial prejudice to the defendant.

In the present case, the State points to absolutely nothing in the record that would indicate that defendant taught the seminars in question. In the absence of such evidence, the cross-examination and comments referring to the seminars were error.

It is held that such prosecutorial misconduct constitutes reversible error where there are reasonable grounds for believing the jury was prejudiced by the misconduct. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629.) Here, we believe that the repeated references to the psychiatric seminars were extremely prejudicial to defendant since they went to the very heart of the State's contention that defendant was malingering. We are unable to conclude that this misconduct did not affect the outcome of this case given the evidence concerning the key issue of defendant's sanity at the time of the offense. Strong evidence of insanity was presented at trial. All three defense experts, after personally examining defendant, unequivocally testified that at the time of the offense defendant was unable to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, and thus was legally insane. They also agreed that defendant was not malingering and that his insanity was not drug induced.

The State, on the other hand, presented no expert testimony that defendant was not legally insane at the time of the offense. One of the State's two experts, Dr. Wasyliw, could not express any opinion as to whether defendant was sane at the time of the offense. The State's other expert, Dr. Wettstein, testified he had no opinion as to whether defendant could conform his conduct to the requirements of the law at the time of the occurrence. Upon further questioning regarding the issue of insanity, Dr. Wettstein stated only that defendant was not suffering from a mental illness; however, as will be discussed later herein, Dr. Wettstein's definition of mental illness did not comport with Illinois' legal definition of insanity and instead served to confuse the jurors as to the legal standard for insanity in Illinois. Furthermore, even the lay testimony presented by the State concerning defendant's conduct on the date of the offense was consistent with a conclusion of insanity: the testimony of assistant State's Attorney Robert Loeb established that defendant did not try to evade the police after the offense, but rather remained at the scene when officers arrived and admitted committing the stabbings, telling Loeb that "God made me do it." *Cf. People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.

We note that the State relies heavily on *People v. Anderson* (1981), 93 Ill. App. 3d 646, 417 N.E.2d 663. We have reviewed that case and find it readily distinguishable from the case before us. In *Anderson*, the defendant raised the insanity defense and presented expert testimony. The State cross-examined a defense expert as to whether he knew that the defendant attended college, without presenting the fact of attendance to the jury. This court did not uphold the propriety of such questioning, but instead ruled that the tactic did not rise to the level of plain error and was harmless in view of the evidence. In so holding, we observed that although the fact of the defendant's college attendance was never presented to the jury, the presentence investigation report indicated that the defendant attended college for three years. We therefore concluded that the question was not asked in bad faith. Clearly, the same conclusion cannot be reached here, where neither the presentence report nor any other evidence in the record made mention of any seminars on psychiatric disabilities, but the State repeatedly referred to the seminars in its closing argument. In *Anderson*, the defendant's college education was not heavily relied on in closing argument, but was only mentioned in passing during cross-examination.

Furthermore, unlike the defendant in *Anderson*, the defendant in the present case *did* raise the issue in his post-trial motion and thus

the issue need not be reviewed under the elevated "plain error" standard applicable in *Anderson*. Finally, the evidence of insanity was far weaker in *Anderson*. Four of the five defense psychiatrists in that case not only declined to express an opinion that the defendant was insane but in fact supported the State's theory that he had feigned symptoms. In view of the foregoing critical distinctions, we find no basis for the State's assertion that *Anderson* is dispositive of the issue now before us.

For the reasons stated above, we view the repeated references to psychiatric seminars as grossly improper and serious error. The State committed additional errors which will be discussed below. We believe that the cumulative effect of these errors denied defendant a fair trial and require that this cause be reversed and remanded for a new trial.

## II

■ Defendant next assigns error to the State's cross-examination of the defense experts concerning defendant's fitness to stand trial. Defendant notes that both Drs. Kaplan and Stipes indicated that defendant was fit to stand trial, while the third defense witness, Dr. Sterling, testified over objection that defendant did not appear fit to stand trial.

Fitness to stand trial does not refer to sanity at the time of the offense. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) Consequently, it is held that a finding of fitness is *not* competent as evidence at the main trial where insanity is raised. (*People v. Bechtel* (1921), 297 Ill. 312, 314, 130 N.E. 728.) *Bechtel* was followed in *People v. Cornelius* (1946), 392 Ill. 599, 601, 65 N.E.2d 439, in which our supreme court stated that a finding as to fitness is a civil matter which "forms no part of a hearing on the criminal charge and evidence concerning it is not competent on the trial of that charge." This holding was reaffirmed by the court in *People v. Reck* (1946), 392 Ill. 311, 317, 64 N.E.2d 526, where it was stated:

> "Of course, the verdict of the jury in the preliminary hearing that defendant was not feeble-minded [*i.e.*, was fit] *is not competent as evidence against him on the hearing of the indictment*. The defense of insanity at the time of the commission of the crime may, therefore, be urged upon the hearing of the cause, unaffected by the finding of the jury that the defendant was not insane at the time the jury was impaneled." (Emphasis added.)

More recently, in *People v. McCullum* (1977), 66 Ill. 2d 306, 362 N.E.2d 307, our supreme court held that the purpose of a fitness

hearing plays no part of the trial on a criminal charge in which liability for an offense is determined.

■■ Based on the above authorities, we find that any cross-examination as to defendant's fitness to stand trial was irrelevant and should not have been permitted. We note that the error as to this issue is compounded by the fact that the State used Dr. Kaplan's finding of fitness to impeach Dr. Sterling's testimony about insanity. In particular, Dr. Sterling was cross-examined as follows:

"Q. Now, you also—you also came up with a finding, at that time, that the defendant was not fit to stand trial, is that right?

MR. PAULL [Defense Attorney]: Objection, your Honor, relevance.

A. I don't know.

THE COURT: I don't know if it is relevant or not, if it is.

MS. GEER [assistant State's Attorney]: Q. Is that right?

A. Is this a statement?

THE COURT: No, I'll take the answer.

A. Okay. I felt he did not appear fit to understand the charges and cooperate with counsel at that time.

MS. GEER: Q. Now, you are aware that on the same date, that Doctor Kaplan examined the Defendant after you examined him, is that right?

A. He examined him on three occasions and wrote his report on the 24th of—about a month after.

Q. In fact, he examined him on four occasions?

A. Four, all right. I stand corrected.

Q. But he also examined him on the 19th of January of 1982, is that not correct?

A. That's what he says.

Q. And on the 19th of January of 1982, Doctor Kaplan says that the Defendant was fit to stand trial and, in fact, he was coherent and oriented, is that right?

MR. BORN [Defense Attorney]: Objection.

THE COURT: I'll take the answer.

A. I don't think he was referring to that specific date. I think after the four interviews, he decided—my impression is that after the four interviews he decided that he was fit.

MS. GEER: Q. He states that the Defendant told him the same things in all four interviews, basically, and that his behavior was essentially the same in all of these examinations?

MR. BORN: Your Honor, I am going to object and ask for a sidebar, at this point.

THE COURT: Overruled.

MR. BORN: Can I have a sidebar?

THE COURT: Refused. Let's get on with cross-examination."

Hence, the State attempted to show disagreement in an area of inquiry that is irrelevant in order to undermine the credibility of Sterling's testimony concerning the key issue of defendant's sanity at the time of the offense.

We observe that the fitness testimony further served to confuse the jurors when it was coupled with the testimony of the State's expert Dr. Wettstein. With respect to the question of insanity, Dr. Wettstein testified that defendant was not mentally ill at the time of the offense. Dr. Wettstein then defined mental disease as "a condition which significantly impairs a person's ability to think or in some cases to act, as well as alters their emotional feelings, at the time, which lasts for a period of time. It just doesn't come and go quickly over a period of time."

While Dr. Wettstein's definition may have medical meaning to clinicians, it clearly does not comport with Illinois' definition of insanity for legal purposes. Insanity in Illinois is statutorily defined as the lack of substantial capacity either to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of the law as the result of a mental disease or defect. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).) The legislature not only omitted an expansive time frame but explicitly defined both insanity and "mental illness" (for purposes of the "guilty but mentally ill" verdict) as a condition afflicting the defendant at the time of the conduct in question. (Ill. Rev. Stat. 1985, ch. 38, pars. 6—2(a), (d).) In *People v. Count* (1969), 106 Ill. App. 2d 258, 246 N.E.2d 91, this court held that only insanity existing at the very time of the crime, and not before or after, can serve as an excuse. In *People v. Yates* (1978), 65 Ill. App. 3d 319, 382 N.E.2d 505, we stated that evidence of prior mental disease is not probative of the defendant's mental state at the time of the offense. *Yates* was later relied upon by this court in *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 421 N.E.2d 1319, to justify exclusion of a witness' lay opinion that the defendant was insane based on incidents occurring months after the offense.

The irrelevance of a mental disease before or after the offense is thus uniformly borne out in case law upholding verdicts of sanity and guilt. Nevertheless, Dr. Wettstein told the jurors that "mental disease" refers to a condition which "lasts for a period of time." Dr. Wettstein's *ad hoc* definition of mental disease underscored the im-

proper suggestion that defendant's fitness at trial was a legally relevant consideration in evaluating defendant's mental state at the time of the offense. Clearly, the cumulative effect of the fitness to stand trial evidence and Dr. Wettstein's testimony was to confuse the legal standard for insanity.

## III

■ Defendant additionally assigns error to the following closing argument remarks by the prosecutor:

> "It's too bad that all this time they are talking about the baby like she didn't exist—like she didn't have a name—a personality—a future—like 26 days—we really can't count that. She probably didn't even know who her dad was, probably couldn't focus. She certainly had not seen her first sunrise or sunset. She was a long way from seeing—well, not that far away from seeing her first Christmas. There are certainly things that that little girl will never, never, ever experience. Certain things that we always take for granted, but we always look back on fondly. Everybody remembers your first day at school. Everybody remembers your first date, your first prom dress you got. Jane Marie Littlejohn will never experience any of those things. Why?"

Defendant argues that the above comments served only to distract the jurors from the real issue of defendant's sanity and to inflame in them sympathy for the victim. The State replies that defendant has waived this error by failing to object at trial. Under the plain error rule (87 Ill. 2d R. 615(a)), this court may elect to review those errors not properly preserved on appeal where the record shows the errors substantially affect the defendant's rights. (*People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298.) In *Starks*, this court reviewed comments similar to those quoted above under the plain error doctrine. There, the prosecutor commented that the defendant "took away his [the deceased's] right to get married, his right to have a happy life, his right to finish school and maybe get a better job, his right to have children if he wanted, his right to buy a house." This court held that actual prejudice accrued to the defendant as a result of such argument. Similarly, we find in this case that the commentary about the dead infant was designed solely to arouse the sympathy and passions of the jurors and was thus improper.

In summary, we find that the conduct engaged in by the State was of such egregious character so as to deny defendant a fair trial. The State's case in rebuttal was based entirely on its allegation that

defendant was malingering. To support this allegation, the State attempted to show defendant's familiarity with psychology by making repeated references to psychiatric seminars that defendant supposedly had taught when the record contained no evidence of any such seminars. The State then confused the jurors about the legal standard for insanity by introducing testimony of its expert which failed to comport with Illinois' legal definition of insanity and by its cross-examination concerning defendant's fitness to stand trial. Finally, we note that in addition to the State's extensive commentary about the dead infant, the State made other comments during closing argument which were intended only to inflame the passions of the jury and to which objections were properly sustained.

In a case as this where the State's misconduct has tainted the entire proceeding from beginning to end, we cannot view the above errors as harmless, particularly in view of the strong evidence of insanity presented by defendant. Accordingly, the judgment of the circuit court is reversed and the cause is remanded for a new trial. We expect that the errors discussed herein will not be repeated on retrial.

Our disposition makes it unnecessary for us to consider the remaining issues raised by defendant on appeal. We note, however, that we believe the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366.

Reversed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.