THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD STACK, Defendant-Appellant.

First District (1st Division)   No. 1—87—2212

Opinion filed March 15, 1993.

CAMPBELL, J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Stephen L. Richards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Carol L. Gaines, Janet C. Mahoney, and Michele I. Lavin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

In *People v. Stack* (1984), 128 Ill. App. 3d 611, 470 N.E.2d 1252 (*Stack I*), this court reversed and remanded on various grounds defendant Richard Stack's convictions and concurrent natural life sentences imposed for the brutal murders of his wife and infant son. Our supreme court affirmed in part the opinion of this court in *People v. Stack* (1986), 112 Ill. 2d 301, 493 N.E.2d 339 (*Stack II*), and remanded the case for retrial. The circuit court held a second jury trial, which resulted in defendant being found guilty again. Because we believe the State has denied defendant a fair trial a second time, we reverse and remand for a new trial.

For purposes of brevity, we adopt, with one major exception discussed below, the recitation of facts given by this court in *Stack I*.

While no witnesses' testimony will be the same in two different trials, and while witnesses testified in this case who did not testify in *Stack I*, the recitation of facts in *Stack I* is sufficiently similar for purposes of this appeal.

The exception we note is the testimony of John Bohr, whom the State called during its rebuttal case. Bohr did not testify at defendant's first trial. We summarize his testimony as follows.

According to Bohr, while imprisoned at the Maynard Psychiatric Unit of the Illinois Department of Corrections on charges of violation of probation, theft and aggravated battery, he and defendant had daily conversations regarding the deaths of defendant's wife and infant son. Defendant informed Bohr on how to go about acting insane so as to get a not-guilty-by-reason-of-insanity (NGRI) verdict. Defendant told Bohr that Bohr should walk along and talk aloud as if he were talking to someone who was not there, tell the doctors that he (Bohr) sees devils and demons coming out of people and also to stand in the yard singing to himself. On more than one occasion, defendant told him that his plan was to get a NGRI verdict, then go to Chester Mental Health Facility and start acting normal so he could be released.

Bohr testified that before the murders, defendant's wife was nagging defendant about drinking too much and his inability to hold a job. Defendant told Bohr he just exploded and stabbed his wife to death with either a broom or pool stick and threw his son against the wall because he got in the way. Defendant told Bohr he knew he was in trouble so he went to the window where he yelled to the police that he had been waiting and had just killed his wife and child. After leaving Maynard, Bohr wrote a letter to then Cook County State's Attorney Richard M. Daley and repeated in the letter the conversations he had with defendant.

I

■ We first address defendant's contention that the State failed to rebut his insanity defense by proof beyond a reasonable doubt. In *Stack I*, we rejected defendant's sufficiency argument on the ground that the evidence presented a classic question of fact to be resolved by a jury after a fair trial. As noted, the evidence the State presented to counter defendant's insanity defense in the two trials was substantially the same; Bohr's testimony only made the State's case stronger. Accordingly, we again hold that the evidence presented in the second trial raised a question of fact which the jury was entitled to resolve against defendant.

## II

We next address whether defendant was denied a fair trial when, according to defendant, the prosecution repeatedly told the jury that defendant would be "automatically released" and "free to kill again" if the jury returned a NGRI verdict. Defendant's claim of prosecutorial error is predicated upon the following discourse during the State's rebuttal argument:

"MR. DI BENNEDETTO [Assistant State's Attorney]: John Bohr. What did he tell you about this guy? He told you that this is what the defendant said. He's going to go back, get found not guilty by reason of insanity, go to Chester, and get out. That's what the defendant said.

MR. KUNZ [Defense attorney]: Objection.

MR. DI BENNEDETTO: He's going to take the pool cues—

THE COURT: Overruled. The jury heard the testimony.

MR. DI BENNEDETTO: He's going to take these pool cues right out of here and go chalk up another one.

MR. KULL [Defense attorney]: Objection.

MR. DI BENNEDETTO: That's the chance you have to take—

MR. KULL: Objection.

THE COURT: Sustained.

MR. DI BENNEDETTO: From a guy like this.

THE COURT: Sustained, counsel.

\* \* \*

MR. DI BENNEDETTO: Ladies and gentlemen, you have to end the mission because the mission isn't over for Mr. Stack, and the mission that he's on won't be over until he does what he told Bohr. He beats a case by not guilty by reason of insanity, and he gets out the door after going to Chester.

MR. KULL: Objection.

THE COURT: Sustained.

MR. DI BENNEDETTO: That's his mission.

THE COURT: Sustained. The jury will be instructed to disregard the last comment.

MR. DI BENNEDETTO: Ladies and gentlemen, that's the mission that he laid out in that penitentiary. The only way you can stop that mission, the only way that you can win is not to let him win. He cannot beat this case. He could conform his conduct. He knew what he was doing. That's clear from the ev-

idence. You can't let him win. The consequences are too severe."

The trial ended on this note.

We first address how our opinion in *Stack I* implicates our present analysis of the above comments. In *Stack I*, this court cited as error the prosecutor's repeated statement during closing argument that "society would 'have to live with' " defendant if the jury allowed him to escape responsibility. Defendant there contended that the statements misled the jury into believing that if he was acquitted for reasons of insanity, he would be returned immediately to society.

Relying on *People v. Wilson* (1983), 120 Ill. App. 3d 950, 458 N.E.2d 1081, we ruled over a dissent that the complained-of remarks were error. This ruling was not affected by the supreme court's opinion in *Stack II* and, accordingly, became the law of the case. (See *Stack*, 112 Ill. 2d at 314, 493 N.E.2d at 345.) In this appeal, defendant contends that notwithstanding this court's ruling in *Stack I*, the prosecution violated the law of the case by repeating the comments.

●■ ■ We believe the law of the case doctrine has limited application to the comments in question in light of Bohr's testimony. Under the doctrine, where the evidence on a subsequent appeal is the same as that on the first or prior appeal, or substantially so, the adjudications of the prior appeal become the law of the case. (*People v. Lyles* (1990), 208 Ill. App. 3d 370, 376, 567 N.E.2d 396, 400.) We believe Bohr's testimony, which was not present in *Stack I*, requires that we distinguish *Stack I* and independently assess whether the prosecutorial comments in question constituted improper comment on the consequences of a NGRI verdict.

■ Although we distinguish *Stack I* on account of Bohr's testimony, we nevertheless hold that the State has again improperly commented on the consequences of a NGRI verdict. Contrary to the State's belief, Bohr's testimony did not give the prosecution a license to arouse fear in the minds of jurors that defendant could in fact walk the streets again if his "mission" were to succeed. Bohr's testimony was only relevant on the issue of defendant's sanity at the time of the crime. (See Ill. Rev. Stat. 1979, ch. 38, par. 6—2 ("A person is not criminally responsible for conduct if at the time of such conduct ***").) To this end, the prosecution had every right to make the most of this testimony insofar as it related to defendant's sanity at the time of the murders. We believe the prosecution went well beyond this parameter, however, and instead used Bohr's testimony to hammer home the idea that *only* the jury's guilty verdict stood between defendant being free to kill again and being incarcerated. These types

of comments could only play on an insanity jury's inherent fear that its verdict might set a dangerous man free.

To support our holding, we again cite *People v. Wilson* (1983), 120 Ill. App. 3d 950, 960-61, 458 N.E.2d 1081, 1088. *Wilson* prohibits prosecutorial comments which convey, implicitly or explicitly, that a jury's NGRI verdict may result in a defendant's release. See also *People v. Alerte* (1983), 120 Ill. App. 3d 962, 458 N.E.2d 1106; *People v. Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081; *cf. People v. Etten* (1975), 29 Ill. App. 3d 842, 847, 331 N.E.2d 270, 274-75, *cert. denied* (1976), 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2207; *People v. Hering* (1975), 27 Ill. App. 3d 936, 944-45, 327 N.E.2d 583, 590-91.

Contrary to the State's assertion, the *Wilson* line of cases, which includes our prior ruling in *Stack I*, is nevertheless persuasive despite the fact that the prosecution here did not comment that defendant would be *automatically* released upon rendition of a NGRI verdict. The State claims that because the prosecutor only told the jury that defendant could be set free sometime down the road rather than right away, the prejudicial nature of the comments is lessened. We disagree as this purported distinction ignores the fact that the prosecutor clearly planted the seed that a NGRI verdict could set defendant free.

We also decline the State's invitation to find the comments proper because they were in response to defense counsel's closing argument, who argued:

"MR. KULL [Defense counsel]: And more importantly, what's the real real [*sic*] flaw? Well Richard Stack, he says, tells him I'll go. Ill [*sic*] be found not guilty by reason of insanity I'll go to Chester. I'll convince the doctors I am sane, and I'll walk out. That ain't what the law is.

MR. STOCK [Assistant State's Attorney]: Objection.

THE COURT: Sustained.

MR. KULL: That's not the law.

THE COURT: Counsel.

MR. KULL: It is what they said in their argument.

THE COURT: Okay. The objection is sustained.

MR. KULL: Fine.

THE COURT: Counselor, don't—

MR. KULL: It ain't true.

MR. STOCK: Judge, objection.

MR. KULL: What he told you what Richard Stack says is not what happened.

THE COURT: The jury will be instructed to disregard it."

While defense counsel's argument was itself improper, we do not believe the intent underlying the prosecutor's comments in rebuttal was to respond to counsel's comments. First, notwithstanding our decision in *Stack I*, the prosecutor throughout the entire trial pushed defendant's fair trial rights to the limit. His comments in rebuttal are only one instance of this unsound trial tactic and cannot, therefore, have as their motive an intent to reply to defense counsel's comments. Second, one of the State's themes in closing argument was to emphasize Bohr's testimony, not as to how it impacted defendant's insanity at the time of the crime, but what could happen to defendant after trial. A comparison of the State's treatment of Bohr's testimony in initial close and rebuttal reveals this much:

"MR. STOCK [Assistant State's Attorney]: Ladies and gentlemen, we also know what Richard Stack is about. What's his plan?

John Bohr told you what Richard Stack's plan is. Richard Stack told John Bohr, play the role a little longer, play the game a little longer; I'll beat the case. I'll be found not guilty by reason of insanity.

I'll go back to Chester. I'll stay there awhile, and then I'm just going to convince the doctors that I'm sane because he knew he could convince the doctors that he was sane.

That's Richard Stack's plan. That's the plan he brought into this courtroom.

* * *

You, folks, are going to have to make Richard Stack take responsibility. It is up to you folks, to stop Richard Stack's plan, his plan to be found NGRI, go back to Chester, convince the doctor's that I'm sane."

Because we determine that the prosecutor's comments were not an invited response to defendant's closing argument, we distinguish *People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297, and *People v. Fox* (1970), 131 Ill. App. 2d 604, 264 N.E.2d 502. These cases were not cited by the parties, but are the two closest cases we have found on the matter.

In *Myers*, defense counsel argued that the jury should not sentence defendant to death and should instead "gamble" that defendant would stay behind bars in a mental institution where he would present no problem to society. The prosecution responded by questioning the jurors whether they wanted to accept this gamble where defendant could inevitably be released and free to kill another. The prosecutor also replied that if this inevitability were to occur, the jury

would be giving defendant the gun and telling him, " '[G]ood boy, John, go out and kill another Carole Ballard' " (*Myers*, 35 Ill. 2d at 335). In finding the comments to not constitute error, the court held that the State's legitimate reply was invited by defendant's argument. *Myers*, 35 Ill. 2d 311, 220 N.E.2d 297.

In *Fox*, defense counsel argued in closing that a NGRI verdict would not result in defendant's release where defendant was still insane. The State responded that although insane, a defendant found NGRI would be subjected to the State's machinery and it would be difficult to determine whether he would be released in 20 years, two years, two weeks or as little as two days. In rejecting defendant's contention that the State had argued that defendant would be released in as little as two days if found NGRI, the court found the State's comments were an invited response to defense counsel's argument and were not seriously prejudicial. *Fox*, 131 Ill. App. 2d at 611-12, 264 N.E.2d at 508.

As the above discussion shows, the holdings of *Fox* and *Myers* deal with prosecutorial comment which defense counsel has invited. Such a situation did not occur here. Moreover, the "invited response" rationale cannot be used to justify comments which, as here, operate to a defendant's substantial prejudice and deny him a fair trial.

Having determined that the prosecutor's comments were error, we must next ascertain whether reversal is required. Prosecutorial misconduct in closing argument warrants reversal and a new trial if the improper comments constitute a material factor in the conviction. (*People v. Linscott* (1991), 142 Ill. 2d 22, 28, 566 N.E.2d 1355, 1358.) The issue is whether the jury could have reached a contrary verdict had the improper remarks not been made. (*Linscott*, 142 Ill. 2d at 28, 566 N.E.2d at 1358.) If a reviewing court cannot say that the prosecutor's improper comments did not contribute to the defendant's conviction, the court should order a new trial. *Linscott*, 142 Ill. 2d at 28, 566 N.E.2d at 1358.

■ This was an emotionally charged case, with a mother and infant horrendously murdered on Mother's Day. Although objections to many of the comments were sustained and the jury instructed to disregard the comments, the prosecution continued with the comments despite the objections. Moreover, the court's subsequent, boiler-plate instruction that the jury was not to concern itself with sentencing or punishment during deliberations was insufficient to cure the damage. (See Illinois Pattern Jury Instructions, Criminal, No. 1.01(4) (2d ed. 1981).) The damage was done. The prosecutor repeatedly played on the jury's inherent fear that its verdict could set a dangerous man

free. The jury was invited to convict defendant, even though it might believe defendant to be insane, in order to keep defendant off the streets and away from society. (*United States v. Jackson* (7th Cir. 1976), 542 F.2d 403, 411.) As the evidence on insanity was closely balanced, we cannot say the comments in question did not influence the outcome of the case.

Our decision to grant defendant a new trial is supported by the recent decision of *United States ex rel. Alerte v. Lane* (N.D. Ill. 1989), 725 F. Supp. 936, *aff'd on other grounds sub nom. Alerte v. McGinnis* (7th Cir. 1990), 898 F.2d 69, a *habeas corpus* review of this court's decision in *People v. Alerte* (1983), 120 Ill. App. 3d 962, 458 N.E.2d 1106.

In *Alerte*, the prosecutor made repeated comments regarding the consequences of a NGRI verdict:

"Mr. Goggin: Are we going to let Frank Alert [*sic*] skate? Are we going to let him get a slap on the wrist again and walk out of this courtroom and—

Mr. O'Donnell: Objection.

Mr. Goggin: (continuing)—and scoff at all of us?

The Court: Punishment is left up to me.

Mr. Goggin: Let him laugh at all of us and escape responsibility? Let him laugh at the Kelly family, a family that no longer has their son, their brother, the baby of the family, the tennis player, the kid with the future, who had a scholarship to college? Tell the Kelly family, 'Forget it, forget it.' We are going to slap him on the wrist and let him walk out because of somebody like [Dr.] Frank Lorimer." *Lane*, 725 F. Supp. at 940.

During his closing argument, defense counsel unsuccessfully attempted to respond to the prosecutors' statement concerning the effect of a finding of insanity. The court, however, sustained the State's objections.

In rebuttal argument, a different prosecutor commented:

"Mr. Owen: Your job is not to evaluate the pluses or minuses of mental health programs of our society; of whether or not we treat mental patients in a good or bad or indifferent manner. Your job is not to determine whether or not what happened to him will deter others, but let me just say this on that point; *that there's one deterrent when you find, that guy, guilty of murder. The deterrent is that he will not get the opportunity to murder anybody else. That's the deterrent.*

Mr. O'Donnell: Object to that, and that's not the law.

The Court: Jury heard the evidence." (Emphasis in original.)
(*Lane,* 725 F. Supp. at 940.)

While this court found the above comments to be error, we neverthe-
less found a substantial basis for supporting the verdict and that it
would not have been different had the comments not been made.
*Alerte,* 120 Ill. App. 3d at 972, 458 N.E.2d at 1113.

In petitioning the Federal district court for *habeas corpus* relief
on the ground that the prosecutor's comments denied him a fair trial,
the district court, after reviewing the entire record, disagreed with
this court's assertion that the erroneous comments did not deny
defendant a fair trial. In its analysis, the district court expressed its
view that the comments were prejudicial and that the trial court
failed to cure this prejudice by sustaining counsel's objection and in-
structing the jury to disregard the comments. Rather, the district
court believed the trial court's comment, that the "[j]ury heard the
evidence," was ambiguous, and "[p]unishment is left up to me," po-
tentially confusing. The trial court's action of disallowing defense
counsel a response to the comments similarly did nothing to minimize
the prejudice. *Lane,* 725 F. Supp. at 943.

The district court in its analysis also criticized this court for not
giving adequate review of the entire record. It believed that evidence
of Alerte's insanity was strong, as shown by the testimony that
defendant had seen numerous psychiatrists and psychologists since
the age of five, spent time in several mental institutions and received
medication to control his violent behavior. *Lane,* 725 F. Supp. at 943.

On the one hand, *Lane* can be distinguished from the instant case.
The trial court's treatment of the comments did not amount to an im-
plicit approval of them. Similarly, unlike *Lane,* where the court did
not sustain the defendant's objections or give any curative instruc-
tions, the trial court here did both. Also, unlike the defendant in
*Lane,* defendant here did not have a history of psychiatric treatment,
aggressive behavior and repeated institutionalization from the age of
five. Finally, *Lane* did not have the testimony of John Bohr and the
State's other lay witnesses, who all described defendant as "normal"
up until the morning of the murders.

On the other hand, *Lane* and this case share in common an egre-
gious murder, a hotly disputed insanity defense, repeated prosecu-
torial comments designed to play on the jury's inherent fear that its
verdict could set a dangerous man free, inadequate judicial response
to the comments, a trial court's prohibition of fair response by de-
fense counsel and the lack of any consequence instruction to cure the

prejudice of the comments. On balance, we believe that *Lane* is more analogous to this case than not.

The specially concurring opinion in this case argues that a defendant suffers a lesser degree of prejudice when the State merely comments that a defendant may be released sometime after a NGRI verdict as opposed to being automatically released. The specially concurring opinion further takes issue with our *absolute* prohibition against NGRI consequence comments, both by the defense and the State, where witnesses like Bohr testify at trial.

We wish to make clear that the State's error in this case occurred because of *how* it used Bohr's testimony. Again, Bohr's testimony was only relevant to show defendant's sanity at the time of the murders. Instead, the State invited the jury to consider Bohr's testimony for the purpose of reflecting upon the consequences of its returning a NGRI verdict. This was error and, under the facts of the case, reversible error.

We wish to further make clear that there is *no* distinction between consequence comments which speak in terms of an automatic release, an immediate release in the near future, or one sometime down the road. All such comments have the same prejudicial effect in insanity cases, and all are not to be tolerated. This is especially so where individuals like Bohr testify. In the face of such testimony, a little consequence comment can go a long way.

In summary, we reverse and remand the case for a new trial. In light of this disposition, our remaining focus is on issues which may reappear on remand.

### III

One issue which may so appear is whether, as a matter of course, the trial court must instruct the jury with defendant's "consequence" instruction, which provided:

> "If you find the defendant not guilty by reason of insanity, he will be evaluated by the Department of Mental Health and Development Disabilities.
>
> A hearing will be held before this Court to determine whether he should be committed to the Department of Mental Health until this Court approves.
>
> If the Court so orders, the defendant will not be released by the Department of Mental Health until this Court approves."

Initially, we again reject defendant's argument that the "law of the case" doctrine required that this instruction be given by the trial court in the instant case. In *Stack I,* we did not hold that the circuit

court erred when it failed to give a curative instruction which correctly set forth the consequences of a NGRI verdict. We only *noted* that such an instruction was not given. (*Stack I*, 128 Ill. App. 3d at 620, 470 N.E.2d at 1258.) Thus, *Stack I* did not dictate that the circuit court was *required* to give defendant's consequence instruction on remand.

We next reject defendant's argument that consequence instructions should be given as a matter of course in all insanity cases. Recently, in *People v. Glenn* (1992), 233 Ill. App. 3d 666, 599 N.E.2d 1220, we addressed this very issue and concluded that such instructions will not as a matter of course result in an insanity jury reaching a more true and correct verdict in all cases.

To support our conclusion, we noted that while our supreme court had yet to address the issue, we had addressed and rejected it in *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058. The tendered instruction in *Meeker* provided:

> "If the defendant is found not guilty by reason of insanity, a hearing shall be held pursuant to Illinois statute to determine whether the defendant is in need of mental treatment."
> *Meeker*, 86 Ill. App. 3d at 169, 407 N.E.2d at 1065.

In *Meeker*, we rejected the argument that a consequence instruction is necessary to forestall an otherwise uninstructed jury from convicting merely to prevent an insanity defendant from returning to the streets. Rather, we found more persuasive the argument that such an instruction invited the jury to be influenced by the consequences of its verdict and to reach compromise verdicts. (*Meeker*, 86 Ill. App. 3d at 170, 407 N.E.2d at 1065.) We also noted that the then-in-effect Illinois statute dealing with post-verdict consequences in insanity cases (see Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—4) "present[ed] a major obstacle to formulation of an instruction concerning consequences." *Meeker*, 86 Ill. App. 3d at 171, 407 N.E.2d at 1065.

In *Glenn*, we noted that no Illinois case had deviated from *Meeker* although other States had reached a contrary conclusion following our decision in *Meeker*. Nevertheless, we agreed with *Meeker* that the giving of a consequence instruction will not as a matter of course result in the jury reaching a more true and correct verdict.

We again adhere to this position. Adequate protections exist to assure that a jury focuses on the sanity determination and not the consequences of its verdict. First, trial courts are charged with control of the courtroom. It is their responsibility in the first instance to assure that the jury understands its role is to determine guilt, not punishment. Second, by promptly sustaining objections and instructing the

jury to disregard improper comment, a jury's attention should remain properly focused. Finally, consequence instructions such as defendant's are not satisfactory. A jury's fear, already heightened by the nature of an insanity case, may not be alleviated by such instructions and may even be more focused after the giving of the instruction. Indeed, defendant's instruction tells the jury that defendant may still be released upon court approval. Thus, the instruction could prompt the same reaction it seeks to avoid. For these reasons, we believe that consequence instructions, as such, have no place in insanity cases.

Finally, we reject defendant's argument that *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, *cert. denied* (1988), 488 U.S. 910, 102 L. Ed. 2d 252, 109 S. Ct. 264, has so weakened *Meeker*'s rationale that consequence instructions be given as a matter of course. In *Gacho*, the court held that a capital sentencing jury in a multiple murder case must be instructed that if it finds sufficient mitigating factors to preclude the imposition of death, the defendant will be sentenced to natural life without the possibility of parole, and can only be freed by executive clemency. *Gacho*, 122 Ill. 2d at 262, 522 N.E.2d at 1166.

We again rely on our analysis in *Glenn* wherein we addressed and rejected this very same argument. There, we distinguished *Gacho* on the ground that jurors impanelled to pass on the death sentence are concerned with sentencing while insanity jurors are impanelled to decide guilt or innocence. While the decision in *Gacho* was prompted by juror misconception in death penalty cases, and while misconceptions similarly exist in insanity cases, the purpose of the respective juries required that *Gacho* be found inapplicable to the insanity setting. *Glenn*, 233 Ill. App. 3d at 681-82, 599 N.E.2d at 1230.

In summary, we reject defendant's argument that the law of the case required that a consequence instruction be given in the instant case and that, on remand, such an instruction should be given as a matter of course. On retrial, the trial court is to do whatever is necessary and proper to assure that neither party comments on the consequences of an NGRI verdict. If Bohr again testifies, this will be difficult. To this end, we reiterate that Bohr's testimony is relevant only as it pertains to defendant's mental state at the time of the crime. The court should assure that the parties' comments are curtailed accordingly and, perhaps, provide a limiting instruction to this effect. We independently urge the State to adopt a trial strategy which will not risk yet another trial.

## IV

We briefly address other prosecutorial comments to assure that they will not be repeated on remand.

Defendant contends that he was denied a fair trial when the prosecutor assumed a highly prejudicial fact not in evidence during the cross-examination of defendant's expert and then later repeated the matter in closing argument. During cross-examination of Dr. Garvin, the prosecutor asked Dr. Garvin: "Of course, [Richard] didn't tell you that in July of 1979 he was arrested in a bar and he began punching patrons in the bar and he threatened to kill anyone who signed [a complaint]." Defendant's objection to this question was sustained. Later, during the prosecutor's rebuttal argument, the prosecutor stated: "1979. When he beat somebody up in a bar and then threatened to kill them if they signed a [complaint]." Defendant's objection to this comment was sustained.

■ We agree that the question and subsequent comment in closing argument were error. Error occurs when the State, on cross-examination, asks a defense witness questions, presuming facts not in evidence, as a precursor to impeachment of that witness, in the absence of rebuttal evidence to substantiate the inquiry. (*People v. Braggs* (1988), 184 Ill. App. 3d 756, 760, 540 N.E.2d 767, 769; *People v. Rivera* (1986), 145 Ill. App. 3d 609, 619, 495 N.E.2d 1088, 1095.) The danger inherent in such questioning is that the jury will ignore any denial, presume the accuracy of the questions' insinuation or innuendo, and substitute that presumption for proof. *Braggs,* 184 Ill. App. 3d at 760, 540 N.E.2d at 769; *Rivera,* 145 Ill. App. 3d at 619, 495 N.E.2d at 1095.

Here, the State failed to prove in rebuttal that defendant "beat somebody up in a bar [in 1979] and then threatened to kill them if they signed a complaint." While the State introduced some testimony regarding a 1979 incident involving defendant becoming abusive in a bar, the State never established that defendant "beat" another person, threatened to kill anyone or was arrested.

The State similarly erred when defendant's expert, Dr. Stipes, was asked during cross-examination if defendant had a breakthrough and began to feel emotion about the murders after receiving his wife's death benefit check from her work which he, according to the State, used to purchase clothes for himself. Defendant's objection was sustained, but no curative instruction was given.

The question posed by the State was obviously improper. No evidence exists to show that defendant profited from his wife's death.

With this question, the State again attempted to prove its case through innuendo. This is not proper. See *People v. Littlejohn* (1986), 144 Ill. App. 3d 813, 494 N.E.2d 677 (reversing conviction in part for State's insinuation that insanity defendant gave psychiatric seminars).

We agree with defendant that other prosecutorial misconduct occurred during trial. We list them as a warning to the State that they not be repeated again: (1) the prosecution's interjection of his personal opinion regarding the contents of experts' records and files: "I've looked at those records and files, and I can't find much [good in defendant] either"; (2) the prosecution referring to the Psychiatric Institute, which is a branch of the circuit court of Cook County, as the "armpit" of the courts; (3) the prosecutor asking defendant's expert on cross-examination whether temporary insanity existed in Illinois; and (4) the State repeatedly emphasizing to the jury that defendant killed his wife on Mother's Day.

None of the above comments were proper. First, a prosecutor's personal beliefs have no bearing on a criminal trial. (*E.g., People v. Scott* (1990), 194 Ill. App. 3d 634, 645, 551 N.E.2d 288, 295.) Second, calling a branch of this State's courts an "armpit" does not deserve comment. Third, the subject of temporary insanity is not relevant in Illinois. (*People v. Littlejohn* (1986), 144 Ill. App. 3d 813, 494 N.E.2d 477; *People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 465 N.E.2d 107.) Finally, comments which are designed solely to arouse the passions and sympathy of the jury are improper. (*Littlejohn*, 144 Ill. App. 3d 813, 494 N.E.2d 477.) On remand, we strongly urge the State to refrain from the course of conduct it took during this trial.

## V

We next address whether the circuit court erred by giving the jury, over defense objection, the "sociopath" instruction. The instruction at issue is the second paragraph of the insanity instruction, which provides:

> "[Abnormality manifested only by repeated criminal, or otherwise anti-social conduct, is not mental disease or mental defect.]" (Illinois Pattern Jury Instructions, Criminal, No. 24—25.01 (2d ed. 1981) (hereinafter IPI Criminal 2d).)

The committee note to this instruction states that the second paragraph is to be given only when the evidence shows "repeated criminal or other anti-social conduct." (IPI Criminal 2d No. 24—25.01, Committee Note, at 549.) It has been held to be error to give this instruction when not supported by the evidence. *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.

■ The State goes to great length to paint defendant as a sociopath. To this end, the State lists every possible bad act defendant ever committed during his adult life. These incidents include drug use, heavy social drinking, husband-wife arguments and barroom fighting. While these incidents may be indicative of a sociopathic personality, the incidents are of insufficient number to justify the giving of a "sociopath" instruction. On remand, assuming the same general evidence of defendant's background, the instruction should not be given. *Fierer*, 124 Ill. 2d 176, 529 N.E.2d 972.

Our holding on this issue obviates the need to address whether the prosecutor erred when he told the jury during initial closing argument that "anti-social conduct *** [i]s not evidence of mental disease." Such comments on remand are not to recur unless the evidence supports the giving of the instruction.

## VI

We next address whether the court erred when, according to defendant, the court precluded defendant's lay witnesses from stating their opinions as to defendant's sanity or mental condition. During the direct examination of defense witness John Principato, defendant asked the witness to give his opinion based on his observation of defendant whether "something was happening to his mental health." The court sustained the State's objection. During the direct examination of defense witness Father Lutz, counsel asked a series of questions which attempted to elicit the witness' opinion on whether defendant's conduct seemed normal. Again, the court sustained the State's objections to these questions. Later, the court explained its ruling by stating that the questions were asked in objectionable form.

■ We review this issue only to assure that the court on remand does not unnecessarily restrict defendant's lay testimony. While the court's comments indicate that the State's objections were sustained because of the improper form of the question, the court's comments leave some doubt as to whether the court understands Illinois law regarding lay testimony.

In Illinois, "a lay witness may give his opinion regarding the mental condition of an individual based on personally observed facts, which must be stated in detail." (*People v. Wright* (1985), 111 Ill. 2d 128, 148-49, 490 N.E.2d 640, 647, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 179, 107 S. Ct. 1327; *People v. Chatman* (1986), 145 Ill. App. 3d 648, 659, 495 N.E.2d 1067, 1074; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §704.3 (5th ed. 1990).) Here, the court's comments may be read as indicating that lay testimony on a

defendant's "mental condition" is improper. This is an erroneous view of the law.

By our discussion of this issue, we do not intend to limit the court's discretion in determining whether proper foundation has been established. We have only addressed the issue on the chance that the court entertained an incorrect view of the law.

## VII

We next address whether the circuit court erred in limiting defendant's cross-examination of John Bohr. Bohr testified that in August 1986, he wrote a letter to Cook County State's Attorney Richard M. Daley relating what defendant had told him. At that time, certain members of Bohr's family had filed aggravated battery charges in another county against Bohr.

During Bohr's cross-examination, and in an attempt to show that in fact a deal with the prosecution had been struck, defendant sought to use statements contained in a police report to show the jury that the beatings the victims took were severe and, consequently, Bohr's motive to curry the prosecution's favor was great. The court sustained the State's objection that the statements were hearsay and could not be used.

On further cross-examination, counsel elicited that after Bohr wrote the letter, the aggravated battery charge, which potentially carried a penalty of years in prison, was reduced to simple misdemeanor battery. Bohr pleaded guilty to this charge and ultimately spent little time in prison because of credit received for time served.

On redirect examination, Bohr testified that he never had any charges pending against him in Cook County, that he never mentioned in the letter to Daley that he had charges pending against him, and that he received nothing in exchange for his testimony. Bohr further testified that the charges were reduced because Bohr's family did not want to prosecute.

Defendant later in surrebuttal attempted to call Bohr's sister, Lisa Oberman, who would testify, according to defense counsel's offer of proof, that she did not agree to drop the charges against Bohr and was never contacted by the prosecution. The court ruled that defendant should bring Oberman to court to make an offer of proof and, after hearing her testimony, the court would make its ruling. Oberman was never brought to court.

●■ We find that the circuit court made no error in limiting Bohr's cross-examination. The court properly prevented defense counsel from using unsupported, unproven allegations within a police re-

port to establish the specifics of the aggravated battery charge. Not only were the allegations hearsay (see *People v. Watkins* (1981), 98 Ill. App. 3d 889, 900, 424 N.E.2d 701, 709), they were also the written statements of a third person being used for impeachment purposes. This is not proper impeachment. *People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003.

As for defendant's allegation of error that Lisa Oberman was denied the opportunity to testify, this simply is not true. A review of the record shows that the court wanted to first hear Oberman's testimony before allowing her to testify in court. Defendant never produced Oberman. Thus, contrary to defendant's assertion, the court did not prevent Oberman from testifying.

## VIII

We next address whether the circuit court erred when it allowed testimony regarding defendant's receipt of his *Miranda* warnings and defendant's subsequent responses. Before trial, defendant moved *in limine* to exclude evidence of defendant's post-arrest silence after he received his *Miranda* warnings. During argument on the motion, all parties acknowledged the opinions in *Stack I* and *II* regarding this issue, and all agreed that evidence of defendant's post-arrest silence was improper. The court ultimately ruled that evidence could be received which showed that defendant received his *Miranda* rights and acknowledged understanding them.

During the prosecution's case in chief, Officer Scott testified that upon arriving at the murder scene, defendant was given his *Miranda* warnings and indicated that he understood each of them. Later, in the State's rebuttal case, Officer Foley testified that defendant was given his *Miranda* rights and indicated he understood them.

During closing argument, the State referred the jury back to the scene of the crime at the point in time when Officers Scott and Foley arrived. The prosecutor stated without any defense objection: "Why didn't he hear God when Scott and Foley put the gun on him and said, go to the door. Why didn't he hear a demon all of a sudden and jump through the window?" Later, and again without objection, the prosecutor stated:

> "He gave him his rights, and he understood his rights. One of them is so important, it shows you the kind of mind that this guy has, that he had that day. Anything you say can and will be used against you in a court of law, Mr. Stack, and translating into a mind of a person who does that, is anything I say can

and will be used for me in court, and so he tells Foley, yeah I killed them."

●■ We address the issue of whether the State can use a defendant's acknowledged understanding of his *Miranda* rights as affirmative proof of his sanity. In *Stack I* and *II*, the courts held that it was improper for the State to use evidence which showed that defendant invoked *Miranda*'s guarantee of silence as affirmative proof of his sanity. The stated rationale of those decisions was that it is fundamentally unfair for the prosecution to breach the implied promise which accompanies the giving of *Miranda* rights, namely, that the exercise of the right to remain silent and to counsel will not be used as evidence against defendant. (*Stack*, 112 Ill. 2d at 306-07, 493 N.E.2d at 1257; *Stack*, 128 Ill. App. 3d at 617-18, 470 N.E.2d at 341; see also *Wainwright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634.) We believe the implied promise rationale, which underlies the decisions in *Stack I*, *Stack II*, and *Wainwright*, covers the situation at bar.

The State should not be allowed to ask whether a defendant understands his *Miranda* rights, rights the State is required to give, and then use his acknowledgement of those rights as evidence of sanity. As stated by the court in *Stack II*, the State may not "exploit the recital of *Miranda* warnings to sing the Siren's song and lure a defendant into creating evidence against himself." (*Stack*, 112 Ill. 2d at 307, 943 N.E.2d at 341.) This rationale is equally applicable to the acknowledgement of *Miranda* rights.

In light of the disposition of this issue, we do not address the propriety of the prosecutor's closing comment. On remand, as evidence pertaining to defendant understanding his *Miranda* warnings is inadmissible, the comments should not be repeated.

## IX

Defendant has raised other issues on appeal which we do not address. We find each of these contentions to be without merit.

## X

In conclusion, this case is remanded for a new trial. Defendant's second trial was less than fair. While defendant is not entitled to a perfect trial, he is entitled to one fair trial. Two trials, each less than fair, do not amount to the one fair trial to which he is constitutionally entitled.

We recognize that our opinion requires the victim's family to endure yet another trial. Fault rests with the State, not this court. We

urge again that the State take precautions to assure that defendant receives a fair trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded.

Reversed and remanded.

O'CONNOR, J., concurs.

JUSTICE CAMPBELL, specially concurring:
Although I dissented from the first appellate decision in this case, I reluctantly agree that this case must be remanded for a third trial and therefore concur in today's decision. However, I respectfully disagree with the majority opinion's rationale.

I

The majority holds that defendant was denied a fair trial because it concludes that the State is not permitted to comment on the possible consequences of a verdict. To reach the conclusion that a new trial is warranted, however, the court likens this case to *People v. Wilson* (1983), 120 Ill. App. 3d 950, 458 N.E.2d 1081, and its progeny. In *Wilson*, the State argued that defendant would be "automatically released" if he was found NGRI. The State did not make that argument in this case. Thus, I conclude that this case is more like *People v. Fox* (1970), 131 Ill. App. 2d 604, 264 N.E.2d 502, where the State raised the possibility (not the certainty) of defendant's release. In *Fox*, as in this case, the NGRI argument was initiated by the State, commented on by defense counsel and then rebutted by the State. (*Fox*, 131 Ill. App. 2d at 612, 264 N.E.2d at 508.) Indeed, this case is stronger than *Fox*, for here the record contains testimony that defendant taught Bohr how to fake an insanity defense and repeatedly stated that he intended to be transferred to the Chester Mental Health Facility, begin acting normal and obtain a release. The State's argument on this point was therefore less prejudicial than that in *Fox*.

I agree with the majority that it was improper for the State to argue that defendant intended to kill again upon release, as the State failed to present evidence to that effect. I also agree that the State had every right to use Bohr's testimony to show that defendant was sane when he killed his wife and infant son. I disagree with the majority opinion to the extent that it suggests that the State may *never* refer to the possibility that a defendant found NGRI may be released at some future date. The introduction of testimony such as that pro-

vided by Bohr in this case argues for an exception to the sort of rule announced today. However, as the majority reaches the contrary conclusion, it is unnecessary for me to reach the issue of whether defendant would be entitled to a "possible consequences" instruction in such a case. See *People v. Glenn* (1992), 233 Ill. App. 3d 666, 680-81, 599 N.E.2d 1220, 1229-30 (leaving open the question of whether prosecutorial comment would justify an instruction).

## II

After reversing and remanding the case due to the State's arguments regarding defendant's "plan," the majority addresses at length a number of issues that may arise on retrial. I disagree with the majority opinion's disposition of some of these issues.

For example, the majority opinion concludes that the trial court erred in tendering the "sociopath" instruction (Illinois Pattern Jury Instructions, Criminal, No. 24—25.01 (2d ed. 1981)) to the jury. Yet in the case relied upon by the majority, *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972, the trial court improperly struck the word "repeated" from the instruction and the record indicated that the defendant had no record of illegal or antisocial conduct (and in fact had a long and distinguished professional career). (*Fierer*, 124 Ill. 2d at 192, 529 N.E.2d at 978.) In contrast, the instruction here was not so altered and the State introduced a number of defendant's prior bad acts. I am not convinced that this court must venture at this time into the area of determining how "repeated" bad acts must be to warrant the instruction. Even if it was error to give the instruction, that error would not, by itself, warrant a reversal in this case. See *People v. Vanda* (1982), 111 Ill. App. 3d 551, 569, 444 N.E.2d 609, 622.

## III

The majority concludes that the State should not be permitted to use defendant's acknowledged understanding of his *Miranda* rights as proof of his sanity. I agree with this conclusion, though not for the reason suggested by the majority.

The majority opinion, relying on the previous decisions in this case and on *Wainwright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634, indicates:

> "The stated rationale of those decisions was that it is fundamentally unfair for the prosecution to breach the implied promise which accompanies the giving of *Miranda* rights, namely, that the exercise of the right to remain silent and to counsel

will not be used as evidence against defendant." (244 Ill. App. 3d at 185.)

The majority opinion concludes that the "implied promise" rationale applies to the facts in this case, but fails to explain this conclusion. The record indicates that defendant eventually spoke to the police after he was informed of his *Miranda* rights; thus, there is no use of post-arrest silence to prove defendant's sanity. I therefore conclude that the aforementioned "implied promise" of *Miranda* is not at issue.

Indeed, *Miranda* requires that

"[t]he warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it." (*Miranda v. Arizona* (1966), 384 U.S. 436, 469, 16 L. Ed. 2d 694, 720-21, 86 S. Ct. 1602, 1625.)

That defendant's statements may be held against him in court could be said to be one of the "express promises" of the *Miranda* warnings. There are exceptions made where the defendant also invokes one of his or her *Miranda* rights. (See, *e.g., People v. Anderson* (1986), 113 Ill. 2d 1, 5-6, 495 N.E.2d 485, 486-87.) But defendant here did not invoke his right to remain silent and does not raise an issue regarding other *Miranda* rights.

Nevertheless, I agree that the acknowledgement here could not be used to prove defendant's legal sanity. In some cases, the probative effect of post-arrest, post-*Miranda* warning silence on the issue of legal sanity is outweighed by its prejudicial effect. (*Greenfield v. Wainwright* (11th Cir. 1984), 741 F.2d 329, 332, *aff'd on other grounds* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634.) The same is true of a defendant's post-*Miranda* warning request for an attorney. (*Vanda*, 111 Ill. App. 3d at 563, 444 N.E.2d at 619.) The assertion of paranoid schizophrenia may fall within the scope of these rules. The appellate decision in *Greenfield* stated:

"[T]he evidence was probative only of petitioner's ability to understand English and to remain calm, which would be consistent with the mental disease of paranoid schizophrenia. The evidence accordingly was not probative of petitioner's sanity." (*Greenfield*, 741 F.2d at 334.)

The appellate decision in *Greenfield* is not the only decision recognizing this phenomenon:

"A manic depressive has manic phases; a paranoid schizophrenic need not, and need not be the less dangerous for not

having them." (*Thomas v. Indiana* (7th Cir. 1990), 910 F.2d 1413, 1414.)

The record in this case contains the expert testimony of Dr. Stipes, who opined that defendant suffered from a paranoid type of schizophrenia. The State has failed to identify any portion of the record that would suggest that defendant's acknowledgment of *Miranda* warnings is inconsistent with defendant's insanity defense. Despite this apparent lack of evidence, and contrary to the State's position on appeal, the State used the acknowledgment to argue that defendant was sane at the time of the killings. The argument was improper.

Whether the argument was reversible error is another question. An isolated reference to post-*Miranda* warning silence as evidence of sanity was deemed harmless in the *Vanda* case. (*Vanda*, 111 Ill. App. 3d at 570-72, 444 N.E.2d at 624.) The *Vanda* court so held based on the extensive record developed on the sanity issue at trial. The Federal decisions denying *habeas corpus* relief in the *Vanda* case elaborated on this point, noting that multiple experts testified on the sanity issue, testimony relating to Vanda's early childhood was introduced and there was evidence suggesting that the insanity defense was fabricated. (See *United States ex rel. Vanda v. Lane* (N.D. Ill. 1991), 758 F. Supp. 1252, 1257-58, *aff'd* (7th Cir. 1992), 962 F.2d 583, 585.) The record here is similar in all of these respects. It is therefore possible that the argument, when considered in isolation, would not warrant reversal. However, when combined with the other closing arguments disapproved in the majority opinion, the State's closing arguments cumulatively rise to the level of plain error requiring reversal.

## IV

The State should not seek solace in this opinion. The State should conclude that this court was in unanimous agreement that the record on appeal contained numerous instances where the State unfairly prejudiced defendant's right to a fair trial. This court also unanimously agrees that it is regrettable that the victim's family will be forced to endure a third trial. The People of the State of Illinois, including the victim's family, are not well served by prosecutorial misconduct. I urge the State to take the steps necessary to ensure that the third trial in this case is the last.