2023 IL App (1st) 180864-U

No. 1-18-0864

Order filed June 30, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CR 9052 |
| | ) | |
| TERRENCE COULTER, | ) | The Honorable |
| | ) | Brian Flaherty, |
| Defendant-Appellant. | ) | Judge, Presiding. |
| | ) | |
| | ) | |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Oden Johnson and Tailor concurred in the judgment.

**ORDER**

*Held*: We affirm defendant's conviction and sentence where: (1) the circuit court did not abuse its discretion in admitting other crimes evidence; (2) the circuit court's finding that hearsay statements were admissible under the forfeiture by wrongdoing doctrine was not against the manifest weight of the evidence; and (3) the prosecutor's improper comments during closing argument were not so prejudicial as to warrant a new trial.

¶ 1    Following a jury trial, Terrence Coulter was found guilty of first degree murder of Dana Haynes and sentenced to 52 years' imprisonment. On appeal, Coulter argues: (1) the admission of the State's extensive other crimes evidence at trial was highly prejudicial; (2) Dana's hearsay statements were inadmissible under the forfeiture by wrongdoing doctrine; and (3) the prosecutor made improper comments during closing argument. For the following reasons, we affirm Coulter's conviction and sentence.

¶ 2                                I. BACKGROUND

¶ 3    Terrence Coulter was charged with counts I through VI of first degree murder of Dana Haynes and count VII of concealing a homicidal death. The State *nolle prosequi* counts III, VI, and VII and proceeded on counts I, II, IV, and V. Before trial, the State filed a motion to allow proof of Coulter's other crimes, including a prior charge of attempted murder against Dana. The court allowed the admission of the other crimes evidence to show Coulter's motive, intent, absence of mistake, and propensity to commit domestic violence. The State also filed a motion to admit Dana's hearsay statements regarding the attempted murder charge under the doctrine of forfeiture by wrongdoing. The circuit court granted the motion. A fitness hearing was held on May 20, 2016, and September 7, 2017. At the conclusion of both hearings, the circuit court found Coulter fit to stand trial.

¶ 4    The case proceeded to trial on January 23, 2018. The evidence at trial revealed the following story of events. Derrick Hayes, Dana's son, was 16 years old at the time of Dana's death. Coulter was Dana's long-time boyfriend and, in November 2007, Derrick, Dana, and Coulter lived together. Derrick spent a lot of time with Coulter and Dana and never noticed Coulter mumble, talk to himself, or act mentally unstable. On November 18, 2007, Derrick went to his cousin's

house. Around 5 p.m., Derrick received a phone call from Dana stating "call the ambulance. T just stabbed me." Derrick stated "T" was Dana's nickname for Coulter. Derrick's cousin, Andrea Lenn, left to help Dana and instructed Derrick to call the police. Derrick did not see Dana until the following week because Dana was in the hospital. Derrick later learned that Coulter had been charged with attempted murder. On the morning of January 25, 2010, Dana told Derrick that she was going to work. The next morning, Derrick noticed that Dana was not home and reported her missing. Patricia Hajden worked for a company called Help at Home with Dana. On January 25, 2010, Dana called Hajden at work and told Hajden that she was not going to work that day. Hajden never saw or spoke to Dana again.

¶ 5     On November 18, 2007, around 5 p.m., paramedic Tracy Van Dyke was dispatched to a stabbing. When she arrived at the scene, Van Dyke found Dana sitting on a swing soaking in blood. Van Dyke noticed stab wounds near Dana's throat, and Dana said she was short of breath. In the ambulance, Van Dyke removed Dana's clothing and discovered more stab wounds. Dana told Van Dyke that her boyfriend pulled her out of a car, threw her to the ground, and stabbed her.

¶ 6     On December 26, 2007, Dana gave Assistant State's Attorney (ASA) Michael Sorich a statement regarding the stabbing incident. In the statement, Dana said she was with Coulter on November 18, 2007. Dana and Coulter had been dating for 12 years, and they had recently got back together. Dana and Coulter went to K-Mart, stopped to get cigarettes and chips, and drove around. Dana's phone rang, and Coulter noticed it was Dana's son calling. Coulter got mad and pushed Dana out of the car. Coulter then grabbed a knife from his trunk and stabbed Dana while she was on the ground in an alley. Dana played dead so Coulter would stop stabbing her, and Coulter eventually got back in his car and drove away. Dana believed she was stabbed 19 times in

the back, arms, neck, and legs. Dana stated that she gave her statement to Sorich freely and voluntarily and had not been forced or threatened by anyone nor was she under the influence of drugs or alcohol.

¶ 7     ASA Torrie Corbin was assigned to the courtroom where Coulter was arraigned on the attempted murder charge. Torrie received a letter dated February 18, 2008, from Dana stating she "made a terrible mistake and that Coulter "was not the person who stabbed me November 17, 2007." The letter also stated that Dana was in shock and scared at the time of the incident, that "everybody was yelling at me" at the scene, and that when she said she wanted to call Coulter, the responding officers assumed Coulter was the offender. On August 25, 2008, Corbin received another recantation letter from Dana and, in early 2009, received a video statement of Dana recanting her initial statements that Coulter was her assailant. On December 9, 2009, Coulter's attempted murder trial was scheduled for February 9, 2010. Coulter was present in court and advised of the February 2010 trial date. Later that day, Corbin had a conversation with Dana outside of the courtroom about the trial date. Dana told Corbin that her recantations were not true and that Coulter was her assailant, but she was afraid.

¶ 8     Ray Ditzler was the owner of the Star Lite Motel. Upon check-in, Ray requests that guests provide a photo identification (ID), and he records the guest's name and address on the motel registration card. Ray also documents the make and model of each guest's vehicle in the parking lot. In late January, police asked Ray for records for Room 28 dated January 24, 2010. Ray testified that the name of the requested registration card was Terrence Coulter with an address of 14800 Kenwood Avenue in Dolton, Illinois. The vehicle recorded on the registration card was a green Chevy van. Ray also testified about a registration card dated January 25, 2010, that listed the same

address and vehicle information and included a credit card receipt time stamped 11:12:12. Ray stated Room 28 was not rented again until after the police finished their search of the room.

¶ 9    On January 25, 2010, Younlaunda Burgess was working at the Star Lite Motel. Around 11:12 a.m., a male came into her office and asked to rent Room 28 for another night. The man filled out a registration card, signed the card "Terrence Coulter," provided an ID and credit card, and told Younlaundra that his car was a green van. Younlaunda noticed a Black female drive a silver car into the parking lot, and she saw the male and female go into Room 28. Five minutes later, the female exited Room 28, got back into the silver car, and drove off. Younlaunda later identified Coulter as the male who rented Room 28 at the Park Forest Police Department.

¶ 10    On January 25, 2010, around 11:30 a.m., South Holland police officer Harold Coleman was running license plates of parked vehicles in the Star Lite Motel parking lot. Coleman saw a male and female walking to a silver Kia vehicle. The license plate of that vehicle came back "clean" with no issues. Two days later, Coleman met with Park Forest Police Department officers and the South Suburban Major Crimes Task Force to discuss the individuals he saw at the Star Lite Motel. During the meeting, Coleman was shown a photograph of Dana and identified Dana as the woman he saw getting into the driver's seat of the Kia. Coleman was unable to make an identification of the male he saw on January 25 although he noticed the male was African American.

¶ 11    On January 26, 2010, Park Forest deputy chief Bryan Ryski was assigned to a missing person case in which he learned Dana was reported missing by her son. Ryski contacted Dana's employer, Help at Home, and discovered Dana had not gone into work that day. Ryski spoke with Dana's relatives, attempted to locate Dana's silver Kia, and placed Dana's information into the

national LEADS database. Ryski later learned about Coulter's attempted murder case and went to Coulter's home at 14800 Kenwood Avenue. Coulter's mother, Rosie Coulter, answered the door and informed Ryski that Coulter was not home. As Ryski left the residence, he noticed a green van parked in front of the house. He ran the van's license plate and learned it was registered at the Kenwood address. Ryski later met with police officer Harold Coleman to get more information about running Dana's vehicle license plate on January 25. Ryski met with Ray, the owner of Star Lite Motel, and received registration cards for January 24 and January 25. Ryski learned that Room 28 was the room that defendant had rented out on those dates.

¶ 12 On January 27, Rosie informed police that Coulter was at Ingalls Hospital. Ryski went to the hospital and learned that Coulter had been admitted into the psychiatric unit around 2 a.m. that day. Coulter told Ryski that he was feeling "fine" and was not medicated. Coulter also stated that, on January 24, he had gone to his brother's house to watch football and then returned home. On January 25, Coulter went to a motel on 87th Street and Halsted Street. Dana called him that morning and told him she was going to work. Although Coulter spoke to Dana at that time, he had not seen her in a long time. Ryski stated Coulter was not laughing, mumbling, or disoriented but responsive and spoke clearly and intelligently. During their conversation, Bryan noticed some inconsistencies between Coulter's statements and the motel information he collected earlier.

¶ 13 Coulter was later released from Ingalls Hospital and agreed to speak with Ryski again. Coulter stated that he went to his brother's house to watch football on January 24. He later went to the Star Lite Motel to be alone because he was hearing voices. When he woke up the next day, he was no longer hearing voices. Dana did not visit him at the motel, and he had last seen Dana two weeks earlier at his house. Coulter stayed another night at the Star Lite Motel on January 25

because he had been drinking. He woke up the next day hearing voices and went to a different hotel. On Wednesday morning, his mother took him to the hospital. Coulter was not on any medications and was not hearing voices at the time of the interview with Ryski. Although Ryski believed Coulter's statements conflicted with his prior interview statements, Ryski observed Coulter was coherent, logical, and not disoriented.

¶ 14    On January 28, 2010, police located Dana's vehicle in Harvey, Illinois, and transported the vehicle to the Park Forest Police Department. On March 23, 2010, Dana's body was found in Thornton, Illinois. Crime scene investigator William Wujek took photos of Dana's body and recovered a knife, shoes, basket, and a bed sheet lying next to Dana's body. Chief medical examiner Ponni Arunkumar reviewed Dana's autopsy report. X-ray results revealed skull fractures in Dana's head, and an internal examination revealed hemorrhaging to various areas of her skull, neck, and shoulders and bruising in the back of the skull. Dana's skull fractures were consistent with blunt force trauma, and her hemorrhages in the neck may have been due to strangulation. Dr. Arunkumar opined Dana's cause of death was multiple injuries due to an assault and the manner of death was a homicide.

¶ 15    Sergeant Sean Grosvenor assisted in processing and searching Room 28 of the Star Lite Motel. During his search, he noticed a red stain that looked like blood on a pillow which he sealed in a bag and transported to the crime lab for testing. Officer Patrick Phillips executed a search warrant at Coulter's address and recovered mail addressed to Coulter, a pair of jeans, two white t-shirts containing a red substance, and a sweatshirt. A green Chevy van was towed to the Park Forest Police Department. Investigator Peter Watson processed a silver Kia Spectra and a green Chevy Gladiator. Watson recovered a brown strand of hair from the trunk of the Kia that he sent

to the crime lab for testing. In the van, Watson recovered an envelope with documents containing Dana's name, a Walgreens receipt dated January 23, 2010, with credit card number 7769, a credit card receipts for the Star Lite Motel dated January 25, 2010, with credit card number 7769, and cigarette butts. Investigator Rober Deel collected carpet standards from the van floorboard. Park Forest Police Chief Pete Green went to Dana's house. Green collected a used feminine napkin in the bathroom garbage can and sent it to the crime lab for testing.

¶ 16    Forensic testing was conducted on the recovered items. The presence of blood was found on the pillow standard recovered from Room 28, Coulter's white t-shirt and jeans, and the feminine napkin. A human female DNA profile identified on the pillow standard matched the DNA profile on the feminine napkin blood sample. The DNA profile found on the pillow standard and feminine napkin matched Dana's DNA profile extracted from a dried blood standard. The blood stain on the white t-shirts matched the profile extracted from Coulter's buccal swab. A male DNA profile identified on the cigarette butt matched Coulter's DNA profile. Three stains found on Coulter's jeans revealed a male profile matching Coulter and a female profile matching Dana.

¶ 17    Sprint Nextel phone records showed Rosie Coulter was a registered subscriber for 708-646-7561 in January 2010 and her mailing address was 14800 South Kenwood, Dolton, Illinois. T-Mobile phone records showed Dana Hayes was a registered subscriber for 708-668-3422 in January 2010. The phone records showed five outgoing calls from 708-668-3422 to 708-646-7561 on January 25, 2010. Chase Bank records showed Terrence Coulter was a Chase Visa credit card holder in January 2010 with number ending in 7769. Coulter's Visa showed a $35 transaction at Star Lite Motel on January 25, 2010, and a $20 transaction at Roseland Marathon gas station in Chicago on January 26, 2010.

¶ 18    Coulter testified he dated Dana and was not responsible for Dana's stabbing in November 2007. In January 2010, Coulter was at the Star Lite Motel by himself. Dana called him, showed up to the motel, stayed for a minute, and then left. Coulter believed the attempted murder case would be dismissed because Dana recanted but learned it was not dismissed when he went to court on December 9, 2009.

¶ 19    Several witnesses testified regarding Coulter's mental condition. Rosie lived with Coulter in Dolton, Illinois. Rosie knew Dana because Dana and Coulter had been dating a long time. In 2007, she noticed that Coulter had become distant and was hearing voices. Rosie took Coulter to Tinley Park Hospital where he was prescribed psychotropic medication. Rosie did not believe Coulter was taking his medication in January 2010 and that his mental state was poor.

¶ 20    Shortly after the stabbing incident, Coulter went to Tinley Park hospital because he was having "issues" and "hearing voices." Coulter described the voices as "threatening" but not telling him to hurt anyone. Coulter went to Ingalls hospital in 2008 because he wasn't taking his medication. Before his arrest in 2010, Coulter went to Ingalls hospital because he was experiencing visual hallucinations and thought he had a chip in his head. Coulter stated that he was not hearing voices at trial, he was testifying as himself, and he alone decided when to listen to the voices. He acknowledged killing someone is wrong and that his delusions did not tell him to hurt anyone. Coulter admitted that he had never been to the hospital prior to Dana's stabbing. In January 2010, Coulter was "having a hard time," was not taking his medication, and was drinking alcohol.

¶ 21    Kanyaran Gerring was dating Coulter at the end of 2009 and 2010. Coulter never told her that he was hearing voices or seeing paranormal visions. Tamika Rice testified she and Coulter began a romantic relationship at the end of January 2010. Coulter never exhibited any strange

behavior, and Tamika never suspected Coulter had any mental health issues. Lenn Thomas, Dana's nephew, stated Dana told him Coulter heard voices and the voices were telling him to kill Dana at the time of the stabbing incident. Lenn had spent a significant amount of time over the years with Coulter and never heard Coulter mumble or act strangely and Coulter never told Lenn that he heard voices. Both Dr. Christopher Cooper and Dr. Alexis Mergias conducted a psychiatric evaluation of Coulter. Dr. Cooper and Dr. Merigas concluded that Coulter was malingering and sane at the time of the offense.

¶ 22    During closing arguments, the State argued that it proved beyond a reasonable doubt that Coulter murdered Dana based on the testimony surrounding the Star Lite Motel and physical evidence. The defense asserted the State failed to meet its burden of proving beyond a reasonable doubt that Coulter murdered Dana given the fact that Dana's whereabouts were unknown after she left Coulter's motel room and the lack of evidence connecting Coulter to the murder.

¶ 23    Before jury deliberations, the court gave the jury several instructions including instructions on finding Coulter not guilty by reason of insanity and guilty but mentally ill. The jury returned a verdict of guilty on all counts. Coulter filed a motion for a new trial arguing, *inter alia*, that the circuit court erred in allowing proof of other crimes evidence and Dana's statements under the doctrine of forfeiture by wrongdoing and that the prosecutor made improper remarks during closing arguments. The court denied the motion. The circuit court sentenced Coulter to 52 years' imprisonment. Coulter filed a motion to reconsider sentence, which the court denied. This appeal follows.

¶ 24                                    II. JURISDICTION

¶ 25    Coulter was sentenced on his first degree murder conviction on April 25, 2018. The same day, Coulter filed a notice of appeal. We have jurisdiction over this appeal pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Mar. 12, 2021).

¶ 26                                III. ANALYSIS

¶ 27    On appeal, Coulter argues: (1) he was denied a fair trial when the State was allowed to introduce extensive other crimes evidence; (2) his constitutional right to confrontation was violated when the court admitted Dana's hearsay statements under the forfeiture by wrongdoing doctrine; and (3) the State committed prosecutorial misconduct when the prosecutor commented Coulter would "walk free" if he was found guilty but mentally ill or not guilty by reason of insanity. We review each issue respectively.

¶ 28                           A. Other Crimes Evidence

¶ 29    First, Coulter argues the volume and detail of other crimes evidence about Coulter's attempted murder charge constituted an impermissible mini-trial. Consequently, the prejudicial effect of the other crimes evidence outweighed any probative value. The State argues the other crimes evidence was properly admitted at trial and necessary to prove the specific charges in count II of the indictment—that Coulter intended to prevent Dana from testifying against him. Moreover, any error was cured by several limiting instructions on other crimes evidence advising the jury to consider it for the limited purpose of Coulter's intent and motive.

¶ 30    Generally, evidence of other crimes is inadmissible if relevant to establish the defendant's propensity to commit crime. *People v. McKibbins*, 96 Ill. 3d 176, 182 (1983). However, evidence of the commission of other crimes is admissible to show modus operandi, intent, identity, motive,

or absence of mistake. *Id.* Section 115-7.4 of the Code of Criminal Procedure provides that evidence of a defendant's commission of other acts of domestic violence may be admitted in a prosecution for first degree murder when the commission of the offense involves domestic violence. See 725 ILCS 5/115-7.4 (West 2018); *People v. Dabbs*, 239 Ill. 2d 277, 291 (2010).

¶ 31    The evidence must be relevant and its probative value must not be substantially outweighed by the risk of undue prejudice. *People v. Torres*, 2015 IL App (1st) 120807, ¶ 40 (citing *Dabbs*, 239 Ill. 2d at 291). "In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider: (1) the proximity in time to the charged or predicated offense; (2) the degree of factual similarity to the charged or predicated offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4 (West 2018). " '[U]ndue prejudice' within the meaning of section 115-7.4(b) necessarily is prejudice other than that resulting from proof of the defendant's propensity to commit domestic violence, because the very purpose of section 115-7.4 is to lift the common-law ban on that particular kind of propensity evidence." *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 77. When admitting other crimes evidence pursuant to section 115-7.4, the trial court "must admit only so much evidence as is reasonably necessary to establish propensity." *People v. Smith*, 406 Ill. App. 3d 747, 756 (2010). We will not reverse the trial court's decision to admit other crimes evidence unless we find that the court abused its discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). We will find an abuse of discretion if the trial court's evaluation is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 32    Our supreme court has held, if other crimes evidence is admitted, it should not lead to a mini-trial of the collateral offense; the court should carefully limit the details to what is necessary

to illuminate the issue for which the other crime was introduced. *People v. Bartall*, 98 Ill. 2d 294, 315 (1983); *People v. McKibbins*, 96 Ill. 2d 176 (1983). This court has found other crimes evidence constituted a mini-trial of the collateral offense where the evidence was unrelated to the offense at issue, excessively detailed, and repetitive. *People v. Nunley*, 271 Ill. App. 3d 427 (1995) (finding that other crimes evidence was excessively detailed and repetitive, unrelated to the crime at issue, and "far more grotesque than that for which he was on trial"); *People v. Brown*, 319 Ill. App. 3d 89 (2001) (finding that other crimes evidence presented by 6 out of the 12 state witnesses was repetitive and switched the focus of the trial to the prior crime).

¶ 33 By contrast, this court has found other crimes evidence did not result in a mini-trial of the collateral offense where the evidence was brief, noncumulative, and relevant to the offense at issue. See *People v. Davis*, 2019 IL App (1st) 160408, ¶ 67 (finding gun testimony did not result in a mini-trial where the first witness's testimony about the recovery was brief and basic, the second witness's testimony "merely established" chain of custody, and gun evidence was necessary to prove an element of the offense); *People v. Torres*, 2015 IL App (1st) 120807, ¶ 47 (finding victim's testimony did not amount to a mini-trial where it was relevant to reveal the development of the relationship between defendant and victim and mirrored the circumstances surrounding the charged offenses).

¶ 34 Coulter argues that Dana's hearsay statements that Coulter stabbed her, the testimony of four witnesses detailing the events surrounding the stabbing—namely, ASA Sorich, Derrick, Van Dyke, and Rice—and the State's opening and closing arguments focused on the attempted murder charge and constituted an impermissible mini-trial. However, considering the totality of the trial evidence, the admission of the other crimes evidence did not constitute a mini-trial of the attempted

murder charge. The other crimes evidence was relevant to show the relationship between Dana and Coulter and Coulter's motive and intent for committing the instant murder offense. Furthermore, the other crimes evidence was not excessive. Derrick and Van Dyke's testimony regarding the stabbing were brief, and all four witnesses provided sufficient detail to give context to the stabbing incident. Despite the other crimes evidence, the State presented testimony from over 13 witnesses, numerous exhibits, and physical evidence solely related to the instant murder offense. While witness testimony surrounding the attempted murder charge may appear repetitive on the surface, such testimony was warranted where each witness gave different prospectives of the same event to give context to the stabbing incident.

¶ 35    Furthermore, the other crimes evidence was not the focus of the State's opening and closing arguments. Most of the prosecutor's argument pertained to the evidence surrounding the murder. The prosecutor only referenced the other crimes evidence when addressing Coulter's motive or intent. During closing argument, the prosecutor stated to the jury, "ladies and gentlemen, you are not here to decide whether or not this defendant stabbed Dana in 2007. You're only to consider that evidence to show that, that was his motive and his intent to kill her in 2010."

¶ 36    We also note that the trial court provided limiting instruction on other crimes evidence and on the fact that closing statements are not evidence and any statement or argument made by the attorneys which is not based on the evidence should be disregarded. See *People v. Illgen*, 145 Ill. 2d 353, 376 (1991) (finding that a trial court's instruction on other crimes evidence "limited and substantially reduced any prejudicial effect created by the admission of the prior-offense evidence"). Therefore, we find that the probative value of the other crimes evidence outweighed

any prejudicial effect. Accordingly, we find the trial court did not abuse its discretion in admitting other crimes evidence at trial.

¶ 37                    B. Forfeiture By Wrongdoing Doctrine

¶ 38    Next, Coulter argues the circuit court erroneously admitted Dana's hearsay statement under the forfeiture by wrongdoing doctrine in violation of his constitutional right to confrontation. Specifically, the State presented no evidence that Coulter intended to prevent Dana from testifying by engaging in "witness tampering, or some type of conduct designed to prevent the witness from testifying, thwart the judicial process, or procure the witness's absence from trial." The State argues that it showed, by a preponderance of the evidence, that Coulter caused Dana's absence by murdering her to prevent her from testifying against him in the attempted murder case.

¶ 39    The sixth amendment to the United States Constitution provides that, in all criminal prosecutions, the accused shall have the right "to be confronted with the witnesses against him." U.S. Const., amend. VI. However, under the common law doctrine of forfeiture by wrongdoing, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington*, 547 U.S. 813, 833 (2006). The doctrine was codified in the Illinois Rules of Evidence in 2011. Ill. R. Evid. 804(b)(5). Rule 804(b)(5) provides an exception to the hearsay rule for "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." *Id.*

¶ 40    The State's burden of proof at a forfeiture by wrongdoing hearing is a preponderance of the evidence. *People v. Peterson*, 2017 IL 120331, ¶ 37. The preponderance standard is a less stringent standard than proof beyond a reasonable doubt or even the intermediate standard of clear

and convincing evidence. *Id.* "Under the preponderance standard, the State need only present evidence that renders a fact more likely than not." (Internal quotation marks omitted.) *Id.* "Thus, in a forfeiture hearing, the State must establish that defendant, more likely than not, 'engaged or acquiesced in wrongdoing' and that such wrongdoing was 'intended to, and did, procure the unavailability of the declarant as a witness." *Id.* Intent may be shown from conduct and the surrounding circumstances. *Id.* ¶ 43. For forfeiture by wrongdoing to apply, the evidence must show that the defendant engaged in witness tampering or some type of conduct designed to prevent the witness from testifying, thwart the judicial process, or procure the witness's absence from trial. *In re Rolandis G.*, 232 Ill. 2d 13, 40 (2008). We review a trial court's decision to admit trial evidence pursuant to the forfeiture by wrongdoing doctrine under the manifest weight of the evidence standard. *Peterson*, 2017 IL 120331, ¶ 39. "A finding is against the manifest weight of the evidence where 'the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.' " *Id.*

¶ 41     The parties dispute whether the State proved Coulter's intent by a preponderance of the evidence. Our supreme court's *Peterson* decision provides guidance. There, the defendant argued that the trial court erred in allowing the State to introduce hearsay statements of the victim, Kathleen, and defendant's wife, Stacy, under the forfeiture by wrongdoing doctrine. *Id.* ¶¶ 11, 36. At the forfeiture hearing, the State theorized defendant murdered Kathleen to prevent her from testifying at a divorce hearing. *Id.* ¶ 45. The evidence revealed that defendant and Kathleen were involved in a tumultuous divorce; two weeks before her death, Kathleen informed her sister to take care of her children if anything happened to her; Kathleen would have testified at an upcoming

divorce hearing; and defendant asked a friend if he knew anyone that could have defendant's "third wife taken care of." *Id.* ¶¶ 45-48.

¶ 42    Moreover, the State theorized the defendant murdered Stacy to prevent her from reporting defendant's involvement in Kathleen's murder or testifying at the divorce hearing. *Id.* ¶ 52. The evidence revealed Stacy was planning to file for divorce; the defendant acknowledged their marital difficulties and was concerned about the financial impact of a divorce; and Stacy was suspicious of the defendant's involvement in Kathleen's death. *Id.* ¶¶ 70-75. The court found that the trial court's finding that the evidence was admissible under the forfeiture by wrongdoing doctrine was not against the manifest weight of the evidence. *Id.* ¶¶ 51, 75. The court found that, although there was no evidence of a specific intent to avoid testimony, the State was only required to prove that the reason for procuring a witness's unavailability was motivated "at least in part" by an intent to prevent the witness from testifying. *Id.* ¶ 50. Thus, the *Peterson* court relied on evidence surrounding the witnesses' unavailability—the tumultuous divorce proceeding and the defendant's tumultuous relationships—in finding that the State established defendant's intent.

¶ 43    Similarly, here, the State showed by a preponderance of the evidence that Coulter intended to, and did, procure the unavailability of Dana as a witness based on the surrounding circumstances. The facts presented at the forfeiture hearing revealed that, at the time of the stabbing, Dana informed several people that Coulter was the person who stabbed her. Coulter was later charged with attempted murder related to the stabbing incident. During the pendency of the attempted murder case, Dana recanted her admission that Coulter was her assailant three times. Two months before the case was set for trial, Dana stated that her recantations were not true and that Coulter was her assailant but she was afraid. Dana ultimately agreed to testify against Coulter

at trial. A few days before the commencement of the trial, Dana and Coulter were seen at the Star Lite Motel. Dana and Coulter met in the motel's parking lot and went into Coulter's motel room. Dana left Coulter's room five minutes later and was not seen again until her death. Dana's presence at the motel was corroborated by physical evidence. Given Dana's multiple admissions that Coulter stabbed her in a prior incident, her statement to Corbin that she recanted her admission because she was afraid, the pending attempted murder case, and Coulter and Dana's meeting shortly before her death, we find that the State proved, by a preponderance of the evidence, that Coulter murdered Dana, at least in part, with the intent to prevent her from testifying at the attempted murder trial. Accordingly, the circuit court's finding that the hearsay statements were admissible under the forfeiture by wrongdoing doctrine was not against the manifest weight of the evidence.

¶ 44                    C. Improper Prosecutor Comments

¶ 45    Lastly, Coulter argues the prosecutor misstated the law and impermissibly discussed punishment when he stated Coulter was "begging" the jury to "let me go" and "let me walk free from this crime" during closing argument. The statement incorrectly implies that a guilty but mentally ill (GBMI) verdict would be equivalent to an acquittal by allowing Coulter to "walk free" or that Coulter would "walk free" if he was found not guilty by reason of insanity (NGBRI). The State argues any error was cured by the circuit court sustaining defense's objection and by the additional instructions given to the jury.

¶ 46    Generally, the prosecution has wide latitude in making its closing argument. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The prosecutor may comment on the evidence and any fair, reasonable inferences from it, even if those inferences reflect negatively on the defendant. *Id.*

However, a closing argument must serve a purpose beyond inflaming the emotions of the jury. *Id.* "A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context." *Id.* "A prosecutor's comments in closing argument will result in reversible error only when they engender 'substantial prejudice' against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence." *People v. Macri*, 185 Ill. 2d 1, 62 (1998). If the jury could have reached a contrary verdict had the improper remarks not been made, or if this court cannot say that the State's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 47    Illinois courts have acknowledged an apparent conflict between two Illinois Supreme Court decisions on the appropriate standard of review to apply in this case. Compare *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (applying an abuse of discretion standard), with *People v. Wheeler*, 226 Ill. 2d 92 (2007) (applying a *de novo* standard). More recently, this court held that no conflict existed between *Blue* and *Wheeler*. *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 61-62. Rather, the holdings in both cases establish that we apply an abuse of discretion standard in reviewing the trial court's ruling on the propriety of the challenged remarks, and a *de novo* standard in reviewing whether any misconduct was egregious enough to warrant a new trial. *Id.* However, regardless of the applicable standard of review, we find the prosecutor's comments do not warrant a new trial.

¶ 48    This court "prohibits prosecutorial comments which convey, implicitly or explicitly, that a not guilty verdict by reason of insanity may result in a defendant's release." *People v. Stacks*, 244 Ill. App. 3d 166, 172 (citing *People v. Wilson*, 120 Ill. App. 3d 950 (1983)); *People v. Singer*, 256 Ill. App. 3d 258, 270 (1993) ("arguments that a defendant found not guilty by reason of insanity

will be released is a misstatement of the law"); *People v. Alerte*, 120 Ill. App. 3d 962, 972 (1983); *People v. Brown*, 104 Ill. App. 3d 1110 (1982).

¶ 49 For instance, in *Stacks*, the defendant was on trial for murder. 244 Ill. App. 3d at 168. During closing arguments, the prosecutor repeatedly stated that society would "have to live with" the defendant if the jury allowed him to escape responsibility. *Id.* at 171. The court found the prosecutor improperly commented on the consequences of a not guilty by reason of insanity verdict. *Id.* The court reasoned the prosecutor's comment "hammer[ed] home the idea that *only* the jury's guilty verdict stood between defendant being free to kill again and being incarcerated. These types of comments could only play on an insanity jury's inherent fear that their verdict might set a dangerous man free." (Emphasis in original.) *Id.* at 171-72.

¶ 50 Furthermore, our supreme court found a prosecutor's comments about a verdict of GBMI were improper given the particular circumstances. *People v. Seuffer*, 144 Ill. 2d 482, 516 (1991). In *Seuffer*, the defendant was on trial for murder. *Id.* During closing arguments, the prosecutor stated, "Let's at least say he's mentally ill so he can avoid some of the responsibility of his actions" and "Guilty but mentally ill. That, ladies and gentlemen, is a compromise verdict to permit him to escape his responsibility." *Id.* The court found the remarks were improper because they "misstated the legal significance of guilty but mentally ill." *Id.*

¶ 51 In this case, the following dialogue took place during closing arguments:

"[MR. LAGERWALL (ASSISTANT STATE'S ATTORNEY):] I want to address an issue right up-front, that there may be some of you sitting in this jury right now, sitting there wondering to yourself, are we supposed to figure out something, is there some issue we're supposed to address or solve? And it may be natural to think that you just sat through

over a week and a couple of days of trial, and as you sat through that trial, you may be sitting there wondering, hmm, there's got to be something we're supposed to be figuring out, this cannot be as clear-cut as possible. It cannot be that obvious that, that guy sitting over there is guilty of first-degree murder and that, that guy sitting over there is faking it. Don't worry, it's clear as possible. It's as clear as can be. His guilt could not be clearer. This defendant, the only issue with this defendant is, he's faking that he's mentally ill. He is begging you please, please, please, please let me go and let me walk free from this crime.

MR. GRACE [(DEFENSE ATTORNEY)]: Objection, Judge.

THE COURT: Sustained.

Please disregard that.

MR. LAGERWALL: He's begging you to let him go from the first-degree murder charge. That's what he's begging you."

¶ 52    By stating Coulter is "faking that he's mentally ill" and begging the jury to "let [him] go and let [him] walk free from this crime," the prosecutor misstated the law on NGBRI and GBMI verdicts. A defendant does not "walk free" if the jury renders either verdict. Section 5-2-4 of the United Code of Corrections provides, if a defendant is found NGBRI, the court must order the defendant to the Department of Human Services for an evaluation as to whether he needs mental health services. 730 ILCS 5/5-2-4 (West 2022). The court must hold a hearing on the Department's evaluation report before any finding that the defendant does not need mental health services and may be discharged from custody. *Id.* Furthermore, section 5-2-6(b) provides, "If the court imposes a sentence of imprisonment upon a defendant who has been found guilty but mentally ill, the defendant shall be committed to the Department of Corrections." See also *People v. Crews*, 122

Ill. 2d 266, 278 (1988) ("[a] GBMI offender is no less guilty than one who is guilty and not mentally ill; unlike insanity, a GBMI finding or plea does not relieve an offender of criminal responsibility for his conduct"). As in *Stacks*, the prosecutor's comment emphasized the idea in the jury's mind that only a guilty verdict stood between defendant being free to commit another crime and being incarcerated and placed an "inherent fear that their verdict might set a dangerous man free." See *Stack*, 244 Ill. App. 3d at 168. The effect of this misstatement of law is further compounded by the fact that it negatively impacts the jury's perception of two different verdicts and was repeated after the trial court sustained the first objection.

¶ 53 Here, we find that the jury would not have reached a contrary verdict had the improper comments not been made because the evidence overwhelmingly supports a finding that Coulter did not suffer from a mental disease, defect, or illness. See Illinois Pattern Jury Instructions, Criminal, No. 24-25.01 (approved Jan. 27, 2023) (definition of insanity); Illinois Pattern Jury Instructions, Criminal, No. 24-25.01(b) (approved Jan. 27, 2023) (guilty but mentally ill). Both Kanyaran and Tamika, Coulter's paramours, testified they were dating Coulter around the time of the murder. Kanyaran testified Coulter never stated that he was hearing voices or seeing paranormal visions. Tamika testified Coulter never exhibited strange behavior and Tamika never suspected Coulter had any mental health issues. Lenn, Dana's Nephew, testified he had spent a significant amount of time over the years with Coulter and never heard Coulter mumble or act strangely and Coulter never told Lenn that he heard voices. Derrick testified that he spent a lot of time with Coulter and never noticed Coulter mumble, talk to himself, or act mentally unstable. Dr. Cooper and Dr. Merigas testified they conducted a psychiatric evaluation of Coulter and concluded

that he was malingering and sane at the time of the offense. Thus, the prosecutor's comments are not so prejudicial as to warrant a new trial.

¶ 54 Indeed, this court previously held error was not so prejudicial as to warrant a new trial in cases where the prosecutor's improper comments were similar to or more inflammatory than in this case. *Alerte*, 120 Ill. App. 3d at 972-73 (finding that prosecutor's improper comment the defendant would "skate," "get a slap on the wrist," or "walk out of this courtroom and *** scoff at all of us" if found NGBRI did not warrant a new trial); *People v. Brown*, 104 Ill. App. 3d 1110, 1120-21 (1982) (finding prosecutor's improper comments that after the defendant had one "break with reality," "he is not responsible for what he did, and let's send him back out in the community" was not reversible error); *Seuffer*, 144 Ill. 2d at 516 (finding prosecutor's remarks about GBMI verdict were cured when judge sustained the defense objection).

¶ 55 We also note that the nature of the prosecutor's comment was not a direct attack on the NGBRI and GBMI verdicts, but at most, an inference that Coulter would "go free" if any other verdict was rendered. See *Alerte*, 120 Ill. App. 3d at 972 ("Since the prosecutors did not directly call upon the jury to convict defendant even though it might believe defendant insane, we do not believe that the comments here constituted the type of violation which requires a new trial."). Therefore, we find that the prosecutor's improper comments were not so prejudicial as to warrant a new trial.

¶ 56                                IV. CONCLUSION

¶ 57 We find the circuit court did not abuse its discretion in admitting the other crimes evidence at trial, and the court's finding that the Dana's hearsay statements were admissible under the forfeiture by wrongdoing doctrine was not against the manifest weight of the evidence. We also

find the prosecutor's improper comments were not so prejudicial as to warrant a new trial.

Accordingly, we affirm Coulter's conviction and sentence.

¶ 58    Affirmed.